UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| JENNIFER WORTHY o/b/o<br>UNITED STATES OF AMERICA,<br>and on her own behalf regarding<br>§ 3730(h) retaliation claims,<br><br>Plaintiff,<br><br>v.<br><br>EASTERN MAINE HEALTH CARE<br>SYSTEMS d/b/a MERCY HOSPITAL,<br><br>CHMB, INC.,<br><br>and<br><br>ACCRETIVE HEALTH, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action Docket No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT (FILED UNDER SEAL); DEMAND FOR JURY TRIAL;
AND REQUEST FOR INJUNCTIVE RELIEF**

This qui tam action under the False Claims Act ("FCA") is being filed ex parte and under

seal as required by the FCA,  31 U.S.C. § 3730(b)(2).  Ms. Jennifer Worthy, for and on behalf of

the United States of America, and on her own behalf regarding her § 3730(h) retaliation claims,

complains against Defendants Eastern Maine Healthcare Systems d/b/a Mercy Hospital ("Mercy

Hospital" or "the Hospital"), CHMB, Inc., and  Accretive Health, Inc. (all three entities

collectively referred to as "the Defendants") as follows:

**SUMMARY OF ACTION**

1.      Defendants violated the False Claims Act by knowingly presenting false claims

for payment from Medicare in violation of Medicare's same day and three-day regulations.

Those regulations prohibit billings by a medical practice solely owned by a hospital for the technical component of all outpatient diagnostic services and related nondiagnostic services (other than ambulance and maintenance renal dialysis services) (hereinafter, "facility charges") when patients are seen in a short period of time by both a hospital and by a medical practice separate from but solely owned by a hospital.  Such charges must be "bundled" together and billed only by the hospital and not by the medical practice.   From August 1, 2013 through February 6, 2014, CHMB and Accretive Health, third-party billing services used by Mercy Hospital, submitted over 1800 prohibited claims for same-day facility charges and about 150 prohibited claims for three-day facility charges by the Hospital and practices owned by the Hospital.  This illegal billing caused Medicare damages of millions of dollars in payments made to Defendants when payments were not owed.  The Defendants also violated the False Claims Act by retaliating against Ms. Worthy because of her repeated complaints about their unlawful Medicare billing practices.

## PARTIES

2.     Ms. Jennifer Worthy is a citizen of the United States and at all relevant times was a resident of Cumberland County in the State of Maine.  Ms. Worthy was employed by Defendant Mercy Hospital at its location in Portland, Maine from November 2, 2012 until her constructive termination on about February 21, 2014.

3.     Defendant Eastern Maine Healthcare Systems d/b/a Mercy Hospital is a hospital providing health care services at a location in Portland, Maine.  In addition to its hospital in Portland, Mercy Hospital provides outpatient services to individuals at a variety of facilities throughout the State of Maine and through about 29 physician practices solely owned by the Hospital.  Mercy Hospital and its wholly-owned physician practices are a hospital as defined by

2

the Social Security Act, as amended by the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010, 42 U.S.C. § 1395ww(d)(1)(B).

4.      Defendant CHMB, Inc. is a corporation based in Escondido, California.  It provides billing services to medical providers and hospitals, including but not limited to, Defendant Mercy Hospital.  Defendant CHMB began providing billing services to Defendant Mercy Hospital on about August 1, 2013.

5.      Defendant Accretive Health, Inc., is a corporation based in Chicago, Illinois.  It provides hospitals and other medical providers with billing and debt collection services and other revenue management services.  Defendant Accretive Health began providing revenue and management billing services to Defendant Mercy Hospital in about May 2012.

## JURISDICTION AND VENUE

6.       Because this action arises under the False Claims Act, 31 U. S. C. §§ 3729-3733, this Court has proper federal question subject matter jurisdiction under 28 U.S.C. § 1331.

7.      Venue is proper in the District of Maine under 28 U.S.C. § 1391(b).  Under Local Rule 3(b), this action is properly filed in Portland because this case arises in Cumberland County.

## JURY TRIAL DEMAND

8.      Under Fed. R. Civ. P. 38(b), Ms. Worthy demands trial by jury of all claims and issues to the extent allowed by law.

## FACTUAL ALLEGATIONS

9.      Beginning on about November 2, 2012 Ms. Worthy worked as a supervisor of patient accounts for Defendant Mercy Hospital at its hospital in Portland, Maine.

10.     In July 2013, after about 10 months of employment, Ms. Worthy was promoted to the position of manager of patient accounts.

11.     Before working for Mercy Hospital, Ms. Worthy had worked for several medical practices as a billing manager for about 11 years.

12.     Ms. Worthy has been a Certified Professional Coder since 2006.

13.     In order to become a Certified Professional Coder, an individual must complete 1600 hours of formal classroom training, two years of on-the-job training, and pass a six-hour test. Ms. Worthy passed the examination in 2006.

14.     During the past two years, Mercy Hospital has acquired and become the sole owner of about 29 private physician practices.  As a result of these acquisitions, Mercy Hospital ultimately became responsible for billing for services provided by these wholly-owned physician practices.

15.     Despite the substantial increase in responsibility for billing arising out of the acquisition of the numerous physician practices, Mercy Hospital did not increase the number of its employees responsible for the billing of patient accounts.

16.     In or about May 2012, Mercy Hospital entered into a contract with Defendant Accretive to provide the Hospital with revenue and management billing services.

17.     The Hospital's goal in hiring Accretive Health was to increase collections while decreasing costs.

18.     In about early 2013, Mercy Hospital decided to contract with Defendant CHMB to perform the billing services for the Hospital's physician practices.

19.     Under its contract with the Hospital, CHMB receives compensation of 3% of the gross billings.

4

20.     *Department of Health & Human Services (DHHS) Pub. 100-04 Medicare Claims Processing Centers for Medicare & Medicaid Services (CMS) Transmittal 167*, which took effect on or before October 1, 2004, provides that if a patient is treated by a physician in a practice owned by a hospital and by the hospital on the same day, the treating physician can bill for professional services on a stand-alone basis, but the facility fees must be charged only by the hospital.  The CMS manual states, "Bills for outpatient hospital services subject to OPPS [outpatient prospective payment system] must contain on a single bill all services provided on the same day except claims containing condition codes 20, 21, or G0 (zero) or kidney dialysis services .…"

21.     Based on section 102 of the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010 (PACMBPRA) (Pub. L. 111-192), codified at 42 U.S.C. 1395ww(a)(4), in November 2011 the United States Centers for Medicare & Medicaid Services (CMS) issued a 3-day payment window requirement that applies to outpatient services furnished by hospitals and hospitals' wholly owned or wholly operated by Part B entities. CMS determined that the statute requires that hospitals bundle the facilities charges with the claim for an inpatient stay when services are furnished to a Medicare beneficiary in the 3 days preceding an inpatient admission so that such facilities charges are billed only by the Hospital and duplication of billing for such services is avoided.

22.     The same day and three day billing rules are designed to prevent multiple billings for facility fees by the same entity for medical treatment rendered at a physician practice owned by the Hospital and then by the Hospital itself.

23.     Medicare billing accounts for about 40% of all bills sent out by Mercy Hospital. About 82% of all of the Medicare bills sent out by Mercy Hospital are governed by the same day or three day regulations.

24.     On or about April 17, 2013, representatives from defendant CHMB, including its owner, Janet Boos, and its account executive for Mercy Hospital, Michelle Pena, visited Mercy Hospital to discuss billing procedures.  The CHMB representatives met with, among others, Accretive Health director of revenue cycle Judi Kieltyka, and with Mercy Hospital's chief financial officer Michael Hachey, vice president of physician services Judy Hawkes, chief information officer Craig Dreher, and Ms. Worthy.  During the April visit, the CHMB representatives did not spend any time reviewing claims processing or the claims follow up work process.

25.     Based upon comments by the CHMB representatives during the April 2013 visit, Ms. Worthy became concerned that CHMB was unfamiliar with the Medicare rules regarding provider-based billing that apply when both the provider and the hospital are owned by the same entity.  Thereafter, both she and her manager at the time, Susan Waltz, began to raise questions internally with Hospital executives Judi Hawkes, Judi Kieltyka, Craig Dreher and Mike Hachey as to how the Medicare same day and 3-day bundling rules would be observed.  The Hospital executives assured Ms. Worthy that CHMB had experience with provider-based billing and had several hospital clients.

26.     CHMB representatives Janet Boos, Michelle Pena, and Melissa Thomas returned to Mercy on June 19, 2013.  Once again, although Ms. Worthy raised questions about how bundling was going to be facilitated, the CHMB representatives did not spend any time reviewing claims processing or the claims follow up work process.

6

27.     On or about July 18, 2013, Ms. Worthy's concerns were further confirmed when a CHMB representative, Jeremy Odom, questioned in an email whether self-pay patients were subject to the same day and three-day regulations. Ms. Worthy had to explain that those regulations applied only to Medicare patients.

28.     Following the questions raised by CHMB representatives, on about July 18, 2013 Ms. Worthy sent an email to the CHMB representatives, Accretive Health director of revenue cycle Judi Kieltyka, and Mercy executives Hawkes, Dreher and Hachey (all of whom had attended the April 17, 2013 meeting) expressing her concerns about CHMB's apparent lack of familiarity with the same day and three-day Medicare billing regulations.

29.     CHMB assumed responsibility for billing for the physician practices owned by Mercy Hospital on August 1, 2013.   At the time that CHMB assumed responsibility for billing for the Mercy physician practices, it had no plan for how to comply with the same day and three-day Medicare billing rules.   Accretive Health director of revenue cycle Judi Kieltyka and executives at Mercy Hospital, including Hachey, Hawkes, Dreher, were all aware of this lack of a plan by CHMB to comply with those Medicare billing rules.

30.     Before taking over responsibility for billing for the physician practices owned by Mercy Hospital, upon information and belief CHMB conducted no testing of its billing system to ensure compliance with Medicare regulations.

31.     Because CHMB was not prepared to handle Medicare billings when it assumed responsibility for the Mercy Hospital outpatient physician practice billing on August 1, 2013, Judi Kieltyka instructed CHMB to hold all Medicare billing until a process was in place to ensure compliance with Medicare regulations.

32.    Senior leadership at Mercy Hospital, including but not limited to Hachey, Hawkes, Dreher, and Ms. Worthy, and Judi Kieltyka from Accretive met biweekly as part of the Committee On Revenue Excellence ("CORE").

33.    As the manager for patient billing at Mercy Hospital, Ms. Worthy had access to the status of Medicare claims and payments through a software system entitled Fiscal Intermediary Support Software ("FISS").

34.    At a CORE meeting on August 21, 2013, Ms. Worthy reminded those present, including but not limited to Hachey, Hawkes, Dreher, and Kieltyka, that CMHB still had no plan in place for complying with Medicare billing regulations.  Ms. Worthy informed the group that CHMB was now holding about $750,000 in Medicare billings on behalf of Mercy Hospital, about 60% of which was tainted by unlawful facility charges.

35.    In early September 2013, Ms. Worthy accessed the FISS system and determined that CHMB was not holding billing as directed but actually had received about $1 million in Medicare reimbursements on behalf of Mercy Hospital.

36.    Ms. Worthy further determined that CHMB was billing and receiving payment from Medicare for same day and three-day visits.  She further observed that while claims to Medicare submitted by CHMB were increasing, Mercy Hospital's accounts receivable was decreasing.

37.    Following her review of the Medicare payments in the FISS system in early September and the decrease in Mercy's accounts receivable, Ms. Worthy reported the apparent Medicare overbilling violations to Judi Kieltyka at Accretive.

38.    CHMB officials Janet Boos, Michelle Pena, and Paula Kacsir (a CHMB Vice President of Client Services who was assigned to the Mercy Hospital account in the fall of 2013)

8

all subsequently denied that CHMB was submitting Medicare claims on behalf of Mercy Hospital and asserted that CHMB was holding all Medicare claims as instructed.

39.     After Ms. Worthy reported the apparent Medicare overbilling violations to Judi Kieltyka in early September, representatives of Defendant CHMB abruptly and without explanation refused to communicate with Ms. Worthy.

40.     In late September 2013, after Ms. Kieltyka did not seem to have taken any steps to correct the Medicare overbilling, Ms. Worthy emailed Peter Angerhoffer, Accretive's Senior Vice President for New England, and asked to speak with him immediately.  She asked Angerhoffer to intervene and told him that the overbilling was exposing Mercy, and thus Accretive, both from a compliance and Medicare cash standpoint, to sanctions.  Angerhoffer promised to resolve the problem.

41.     Ms. Worthy continued to monitor the FISS system throughout September and October and found that Defendant CHMB was continuing to receive payments from Medicare as well as submit claims and re-submit the same claims on behalf of the Mercy Hospital physician practices in apparent violation of the same day and three-day regulations and duplicate claim submission regulations.

42.     In about October 2013 Ms. Worthy began providing Mercy Hospital CFO Hachey and Accretive director of revenue cycle Kieltyka with daily reports about the Medicare billing violation problems. Hachey repeatedly directed Ms. Worthy back to Kieltyka even though Hachey knew that Kieltyka was not pursuing a resolution in compliance with the Medicare Claims Processing Manual.

43.     On October 15, 2013, Hachey convened a meeting with Hawkes, Dreher, Kieltyka, Ms. Worthy, and Janet Boos, CHMB's President, who participated by telephone.  By

9

that date, Ms. Worthy had reported her concerns about Medicare billing violations at least a dozen times to Accretive Health executive Kieltyka and Mercy Hospital executives, including Hachey, including about what she believed were violations of the same day and three-day regulations. During the conversation, Boos committed to recruiting someone familiar with provider-based billing to work as a resource for CHMB to help CHMB to understand how to ensure compliance with their Medicare billing on behalf of the Hospital's physician practices.

44.     At the CORE meeting on October 16, 2013, Ms. Worthy presented documentation regarding the Medicare billing violations and the large volume of the improper claims.  She further advised the attendees that although there is a 60-day grace period to correct erroneous Medicare billing, 75 days had now gone by, making CHMB's illegal billing a compliance issue. In response to the concerns expressed by Ms. Worthy, Hachey proposed to convene a task force composed of himself, Hawkes, Kieltyka, Dreher, Hawkes's assistant Marybeth Winschel, and Ms. Worthy to attempt to resolve the illegal billing.

45.     The task force met on October 17, 2013.  At the meeting, Kieltyka warned Ms. Worthy not to make any more statements about improper Medicare billing by CHMB at the biweekly CORE meeting.  Ms. Worthy advised the task force that representatives of CHMB were not speaking with her and that the actual financial numbers could not be reconciled with CHMB's claim that it had a Medicare hold still in place.

46.     On October 22, 2013, Ms. Worthy discovered on the FISS system a highly unusual claim by Mercy Hospital in excess of $1 million.  A claim of that magnitude was unprecedented for Mercy Hospital.

47.     Ms. Worthy deduced from this claim that, contrary to the representations by CHMB, CHMB was continuing to submit claims on behalf of the Mercy physician practices to Medicare for adjudication and payment.  Although Ms. Worthy notified both Hawkes and Kieltyka about this discovery, neither responded.  After Ms. Worthy notified Hachey a second time, he again redirected her back to Kieltyka.

48.     At a CHMB site visit on October 30, 2013, Ms. Worthy again questioned Kieltyka for an explanation of why CHMB appeared to be submitting claims on behalf of the Mercy physician practices to Medicare for adjudication and payment in violation of the same day and 3-day billing rules.  Kieltyka never responded.

49.     In early November 2013, Ms. Worthy met with Peter Angerhoffer, Accretive's Senior Vice President for New England, and again raised the concerns she had raised with him previously about the illegal Medicare overbilling.  She further told him about the $1 million Mercy claim and that she had concluded that CHMB was not holding but was submitting claims on behalf of the Mercy physician practices for payment to Medicare.

50.     On November 11, 2013, Ms. Worthy emailed Kieltyka and advised her that it was becoming impossible for Ms. Worthy to perform her job duties because CHMB representatives were refusing to speak with her about the major Medicare billing violation issues.

51.     That same day, after she had received the email from Ms. Worthy, Kieltyka came to Ms. Worthy's office and told Ms. Worthy that working with Defendant CHMB was Ms. Worthy's responsibility and that lack of resources was not an excuse for lack of performance. Ms. Worthy responded that there was no lack of performance on her part and that the problems were with CHMB's lack of compliance with Medicare billing regulations.

52.     Kieltyka then informed Ms. Worthy that she (Kieltyka) had told Hachey that Ms. Worthy was struggling and had recommended to Hachey that Ms. Worthy step down and take a position as an administrative assistant.  Ms. Worthy denied that she was struggling and responded that she had no interest in working as an administrative assistant and wanted to continue in her position as billing manager.

53.     In November, Ms. Worthy attended a Revenue Cycle Managers meeting with Angerhoffer and Kieltyka from Accretive and Mercy department managers Shonda Menezes, Mercy's Coding Manager, and Mary Goodwin.  The participants discussed why Medicare cash was down.  Ms. Worthy repeatedly stated that billing for Mercy was being done in violation of Medicare regulations and (on the private payer side), contrary to many of the Hospital's contracts.  In response, Angerhoffer declared, "I don't know why you are so upset about something you cannot do something about.  Why aren't you this upset about the fact that Mary [Goodwin, who manages up front patient collections and scheduling] and her team haven't met their up-front cash collection goals and do something about that?"  Ms. Worthy continued to complain about the blatant compliance issues and explained that the scope of her position was to support Mary Goodwin as a peer but that she was not responsible for up front collections.

54.     On November 25, 2013, CHMB Vice President Paula Kacsir indicated that CHMB had submitted a large claim to Medicare on behalf of the Mercy physician practices.  She claimed that the need to resubmit the claims was due to an "internal" error by Medicare.  However, because the Hospital appeared to continue receiving reimbursement without interruption for its own billing, Ms. Worthy told Kieltyka that something was amiss.  In Ms. Worthy's experience, if there was an error on Medicare's part, it would not tell a provider to resubmit a claim.  Accordingly Ms. Worthy concluded that Kacsir's explanation of an "internal"

12

error was improbable and more likely was an error on CHMB's part which demonstrated that even four months after assuming responsibility for billing for the Mercy physician practices, CHMB still did not understand provider-based billing and how to appropriately and compliantly file facility charges on the UB claim forms.

55.     On a number of occasions dating to the inception of the Hospital's contract with CHMB to bill for the Mercy physician practices, Ms. Worthy questioned why CHMB was having such difficulty complying with the Medicare same day and 3-day rules if CHMB were so experienced with hospital Medicare billing. When previously questioned about this at CORE meetings, Judi Hawkes had maintained that Mercy had "special" Medicare considerations that did not apply to hospitals on the West Coast where CHMB had contracts to provide billing services.  At a Medicare Billing Compliance Boot Camp which Ms. Worthy attended the first week in December 2013, on about December 2, 2013 she confirmed with a trainer with HC Pro who was attending the meeting that Hawkes's explanation could not be true and that the only exception to the same day and 3-day billing rules were three critical care hospitals in Maryland, tribal hospitals, long-term critical care hospitals, and hospitals in Guam, the US Virgin Islands, the Marianas, and American Samoa.

56.     Following her conversation with the trainer, Ms. Worthy telephoned Kieltyka that night and detailed her conversation with the trainer.  Ms. Kieltyka concurred and said she had been raising the same questions with CHMB and Hawkes.  When Hawkes continued to claim that Mercy was "different" at the CORE meetings in December and January, Ms. Worthy challenged her but received no response.

57.     On December 4, Ms. Worthy emailed Janet Boos questioning if CHMB had identified someone to assist it with compliance with the Medicare same day and 3-day billing rules.  Boos never responded.

58.     On December 12, 2013, with no progress having been made on resolving the Medicare billing violation issues, Hachey convened a work group consisting of CHMB's Janet Boos, Michelle Pena, and  Paula Kacsir by phone; Mercy personnel Hawkes, Winschel and Coding Manager Shonda Menezes; and Accretive director of revenue cycle Kieltyka to further address the issue.

59.     During the December 12, 2013 conference call, Boos admitted for the first time that CHMB in fact had been billing claims to Medicare back to August 1, 2013, the date it took over responsibility for billing for the Mercy physician practices, and that it had submitted mass rebills on October 25 and December 11.  Boos attributed the errors to CHMB's technology, even though Ms. Worthy had offered appropriate level education with regard to this issue on multiple occasions to several staff on Boos team.  When Ms. Worthy suggested that CHMB purchase the FISS software to assist it in Medicare billing, Boos opposed doing so asserting that the software was too costly.

60.     After the December 12 conference call, Ms. Worthy analyzed the CHMB billing claims by using the FISS system for a two-week period of time.  She determined that for visits for which it wrongfully had billed and received payment from Medicare, CHMB was opening dummy accounts under names of individuals who had received no treatment whatsoever.  Ms. Worthy was able to determine that no treatment had been received because there were no medical records associated with these dummy accounts.  The amounts in the dummy accounts corresponded with the amounts received from Medicare by CHMB for actual visits.

61.     Ms. Worthy was able to determine through the FISS system that CHMB was not billing Medicare for the dummy accounts.  However, the dummy accounts served to falsely inflate Mercy Hospital's accounts receivable.  Tyler Chase and Richard Moulton, who work for Mercy Hospital Information Services, attempted to run an audit trail on the payments being received erroneously by CHMB.  They determined that because a dummy operator had been set up to create new dummy accounts it was now virtually impossible to identify an individual on the CHMB end.

62.     During the time period in which Mercy Hospital's accounts receivable were being falsely inflated by CHMB, the Hospital was attempting to merge with another hospital system, Eastern Maine Healthcare Systems.

63.     On December 19, 2013, Ms. Worthy asked Michelle Pena how CHMB managed Medicare claims for its other clients that were regulated by Provider Based Billing.  She did not receive any response.  Although Ms. Pena and other CHMB executives, including Boos, had indicated previously that they had other hospital clients, no one ever responded to Ms. Worthy's question.

64.     On January 7, 9, and 10, Ms. Worthy spoke with Kieltyka and Michelle Pena at CHMB about her findings.  Pena admitted during the conversations that the creation of the dummy accounts and the billings to Medicare were improper.

65.     On January 9, 2013, Ms. Worthy filed an internal complaint about the Medicare billing violations with Jean Eichenbaum, Mercy Hospital's compliance officer.  Ms. Worthy informed Kieltyka that she had filed a complaint about the illegal billings.

66.     Eichenbaum directed Ms. Worthy to contact Maggie Fortin, a Medicare Subject Matter Expert employed by Baker, Newman & Noyes.

67.     Fortin conducted an investigation and met onsite with Kieltyka, Ms. Worthy and Menezes.  Fortin reviewed the process in place and looked into Ms. Worthy's allegations by an audit of Medicare 835 electronic payment remittances and prepared a report for Mercy Hospital.

68.     Although Fortin did not provide a copy of her report to Ms. Worthy, Fortin orally told Ms. Worthy that she agreed with Ms. Worthy's conclusions about the improper Medicare billing and receipt of funds.  Fortin warned Kieltyka in person and in the presence of Ms. Worthy and Menezes that Medicare guidelines were very clear prohibiting the separate claim submission by the Hospital and its physician practices on services rendered that fell under the Same Day and Three Day Payment Window Regulations.

69.     Before her January 9, 2013 complaint to Eichenbaum, Ms. Worthy worked in an office by herself.  Within a few days of Ms. Worthy's complaint to Eichenbaum, Mercy Hospital assigned Brie Farmer and Anvita Kumar, two contract employees from Accretive Health who were not in the reporting structure for Ms. Worthy, to work in Ms. Worthy's office.  Thereafter, Ms. Worthy never was left alone in her office.

70.     Farmer and Kumar almost constantly questioned Ms. Worthy about her daily workload, her projects, her staff's productivity, her calendar and commitments.  Kumar acted in a hostile and intimidating manner toward Ms. Worthy.  Kumar accused Ms. Worthy on multiple occasions of poor decision-making and forbid her to send emails to CHMB without her initial review and editing.  Farmer was instructed by Kieltyka to document all tasks Ms. Worthy was working on.  Kieltyka directed Ms. Worthy to meet either with Farmer or Kumar for the first ten minutes of every day to update them on Ms. Worthy's progress.

71.     On January 14, 2014, Lora Morse, a Revenue Integrity auditor employed by Mercy, emailed Ms. Worthy expressing  concern that CHMB had failed to contact Ms. Worthy

regarding  denials  for dressings and that CHMB had modified the billing code without Ms. Worthy's approval after these claims had been rejected by Medicare.  Dressings are supposed to be bundled with the Hospital's billing; by changing the code and unbundling the claims, CHMB improperly had obtained reimbursement for such claims.  Morse was concerned that by doing so, CHMB had exposed Mercy to compliance issues.  Upon information and belief, CHMB never returned these wrongful reimbursements to Medicare.

72.     On January 14, 2014, Kieltyka met with Ms. Worthy.  In the meeting, Kieltyka confirmed that she knew Ms. Worthy had filed a compliance complaint because Kieltyka had been interviewed about it.

73.     During this January 14 meeting, Kieltyka told Ms. Worthy that she understood that Ms. Worthy felt powerless but that it was Ms. Worthy's job to handle accounts receivable and that she had failed to do so.  When Ms. Worthy responded that she had reported her concerns for months about the CHMB billing practices to no avail, Kieltyka replied that Ms. Worthy was inexperienced and that if she were more mature and experienced, Ms. Worthy would understand that it takes time to correct the errors.

74.     Kieltyka then told Ms. Worthy that it wasn't Ms. Worthy's time at Mercy Hospital, that things happen for a reason, and that she had reached out to someone at Dartmouth Hitchcock Medical Center in New Hampshire to replace Ms. Worthy.

75.     Kieltyka promised to help Ms. Worthy find another job at Mercy Hospital, working directly for Kieltyka as an Administrative Assistant or under Hawkes as a Practice Manager.

76.     Following the January 14, 2014 meeting with Kieltyka, Ms. Worthy continued to report to Hachey and Kieltyka about the Medicare overbilling violations.  Ms. Worthy also had

Kumar prepare a "dashboard" of accounts receivable metrics for the CORE meeting scheduled for January 22 to graphically demonstrate the Medicare billing violations by CHMB.

77.     Upon learning of Ms. Worthy's plan to present the graphic information about Medicare billing violations at the upcoming CORE meeting, Kieltyka directed Ms. Worthy by phone not to do so.  Ms. Worthy questioned why she could not do so and complained that eight months had passed and the Medicare billing violations still had not been corrected.  Kieltyka responded in a demeaning fashion that Ms. Worthy was inexperienced and there was no appropriate audience at CORE.

78.     On January 23, 2014, Ms. Kieltyka met with Ms. Worthy and criticized Ms. Worthy's job performance, advising Ms. Worthy that Ms. Worthy ultimately was responsible for revenue recovered by CHMB on behalf of the Mercy physician practices.  Ms. Worthy reminded Kieltyka that she had been trying for months to rectify problems with CHMB and responded that she felt it was unfair to hold her accountable for matters over which she had no power.  Ms. Worthy expressly told Kieltyka that she was concerned about the Hospital's potential liability and asked Kieltyka if Kieltyka wanted Ms. Worthy to remain at Mercy Hospital. Ms. Worthy explained that she felt that she was being forced out of her job.  Kieltyka responded, "It is not that I don't want you but I don't think you are a good fit any more."

79.     During the January 27 meeting, Ms. Worthy specifically asked Kieltyka for a written performance appraisal.  Kieltyka responded that she did not conduct these.

80.     On January 28, 2014 Ms. Worthy gave her 30-day notice of resignation.  In her notice to Hachey and Will Saxe, Mercy Hospital Corporate Counsel, Ms. Worthy made it clear that she felt that she was being forced out of Mercy Hospital.

81.     Ms. Worthy resigned after she had unsuccessfully exhausted all reasonable efforts to remedy the major Medicare billing violations.  She could not in good conscience continue to work on billing matters for an employer that was knowingly violating Medicare billing requirements and was not promptly correcting the violations but in fact was receiving payment in violation of the Medicare billing rules.

82.     After Ms. Worthy gave her 30-day notice, Hachey requested and on February 3, 2014 Ms. Worthy provided him with a detailed description of the Medicare billing violations.

83.     Ms. Worthy's last day of employment at Mercy Hospital was February 21, 2014. When she left her employment at Mercy, no plan existed to determine the amount that CHMB had wrongfully billed and received, to report the wrongful billing to Medicare, or to refund to Medicare the wrongfully obtained money.

84.     On about February 21, 2014 Ms. Worthy  reported to Hachey by email that CHMB would continue to receive erroneous payments following the last confirmed claim run of February 6, 2014 and that Kieltyka had signed the Fourth Quarter, 2013 Medicare Credit Balance report knowingly omitting the overpayments.

85.     As of February 21, 2014, Defendant CHMB still had not hired an educator provider-based resource as it had promised four months earlier.

86.     In addition to the cancellation of the scheduled January 22 CORE meeting, Kieltyka and Hachey also cancelled future CORE meetings until after Ms. Worthy had stopped working at the Hospital, thereby precluding her from presenting her concerns about the illegal billing to Kieltyka, Hachey, Hawkes, Dreher, and others as a group.

## COUNT I
### (For Violation of the False Claims Act by Mercy Hospital)

87.     The allegations in paragraphs 1-86 are realleged.

88.     By virtue of the foregoing, Defendant Mercy Hospital wrongfully received funds from Medicare in violation of the False Claims Act by permitting and acting in concert with its third-party billing agent CHMB and its revenue enhancement agent Accretive to bill and accept payment from Medicare for patient visits to physician practices solely owned by the Hospital contrary to the same day and three-day Medicare regulations.

## COUNT II
### (For Violation of the False Claims Act by CHMB)

89.     The allegations in paragraphs 1-88 are realleged.

90.     By virtue of the foregoing, Defendant CHMB wrongfully billed and accepted payment from Medicare for patient visits to physician practices owned by the Hospital contrary to the same day and three-day Medicare regulations and in violation of the regulations barring duplicate claim submissions.

## COUNT III
### (For Violation of the False Claims Act by Accretive Health)

91.     The allegations in paragraphs 1-90 are realleged.

92.     By virtue of the foregoing, Defendant Accretive Health wrongfully received compensation from payment from Medicare for patient visits to physician practices owned by the Hospital contrary to the same day and three-day Medicare regulations and in violation of the regulations barring duplicate claim submissions.

## COUNT IV
### (For Retaliation in Violation of the False Claims Act by Defendants)

93.     The allegations in paragraphs 1-92 are realleged.

94.     By virtue of the foregoing, Defendants retaliated against Ms. Worthy for her whistleblower reports about Medicare billing violations by subjecting her to demeaning oversight and supervision by employees of Accretive Health, to a hostile and abusive work

environment, heightened and unwarranted scrutiny and criticism, and other adverse work conditions that would deter a reasonable person from making such whistleblower reports.

95.    Defendants further retaliated against Ms. Worthy by taking away her own office and threatening to reassign her to a much less desirable job position.  Ms. Worthy's resignation was as a fitting response to these employer-sanctioned adverse actions officially changing her employment status and situation.

96.    Defendants constructively discharged Ms. Worthy from her job.  Ms. Worthy reasonably believed that her job was in jeopardy, was repeatedly told by her supervisors that her performance was unacceptable, and was not given support to perform her job when she requested it.  This abusive working condition became so intolerable that a reasonable person in her position would have felt compelled to resign.

97.    As a direct and proximate result of the Defendants' intentional discrimination and retaliation against Ms. Worthy, she has suffered and will continue to suffer damages, including, but not limited to lost wages and benefits, humiliation and embarrassment, financial distress, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, injury to career, deprivation of professional and career opportunities and other pecuniary and non-pecuniary losses.

## PRAYER FOR RELIEF

98.    Ms. Worthy prays that this Court enter judgment in her favor and grant the following:

A.  On Counts I, II and III, repayment to the United States of all moneys received by Defendants in violation of Medicare's legal requirements including but not limited to moneys received in violation of the same day and three-day rules.

B.  On Counts I,  II and III,  payment to Ms. Worthy of 25% of any recovery from Defendants for violation of the False Claims Act;

C.  On Count IV, order Defendant Mercy Hospital to pay Ms. Worthy 2 times the amount of back pay and interest on the back pay, and order Defendant Mercy Hospital to reinstate Ms. Worthy or, if reinstatement is impracticable, to pay Ms. Worthy front pay;

D.  On Count IV, order Defendants  to pay Ms. Worthy compensatory damages;

E.  On all Counts, order Defendants to pay Ms. Worthy's pre-judgment and post-judgment interest and all cost, litigation expenses, reasonable attorneys' fees, and all expert witness fees;

F.  Grant such additional relief as this Court deems appropriate.

Respectfully submitted,

Dated:  April 29, 2014

*/s/ Jeffrey Neil Young*
Jeffrey Neil Young
JOHNSON, WEBBERT & YOUNG, LLP
160 Capital Street, Suite 3
P.O. Box 79
Augusta, ME 04332-0079
(207) 623-5110
jyoung@johnsonwebbert.com

*/s/ David G. Webbert*
David G. Webbert
JOHNSON, WEBBERT & YOUNG, LLP
160 Capital Street, Suite 3
P.O. Box 79
Augusta, ME 04332-0079
(207) 623-5110
dwebbert@johnsonwebbert.com

*Counsel to Plaintiff*