UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA, *ex rel.*  )
JENNIFER WORTHY,                      )
                                      )
    and in her own name solely    )
    regarding individual retaliation )
    claims,                        )
                                      )
        Plaintiff/Relator,    )
                                      )
    v.                             )      2:14-cv-00184-JAW
                                      )
EASTERN MAINE HEALTHCARE              )
SYSTEMS,                              )
                                      )
MERCY HEALTH SYSTEM OF MAINE,         )
                                      )
MERCY HOSPITAL d/b/a MERCY            )
MEDICAL ASSOCIATES,                   )
                                      )
CALIFORNIA HEALTHCARE                 )
MEDICAL BILLING, INC.,                )
                                      )
    and                            )
                                      )
ACCRETIVE HEALTH, INC.,               )
                                      )
        Defendants.           )

## ORDER ON MOTIONS TO DISMISS

Jennifer Worthy claims that the Defendants violated the False Claims Act by submitting false and fraudulent claims to the Medicare program through unlawful billing practices. She also claims that the Defendants retaliated against her in violation of the False Claims Act and Maine Whistleblowers' Protection Act because of her efforts to stop the unlawful billing practices. Each of the Defendants moves to

dismiss Counts I, II, IV, and V of the complaint.  The Court grants in part and denies in part each of these motions.  Specifically, the Court grants California Healthcare Medical Billing's motion to dismiss Count V, the retaliation count, in its entirety because there is no factual allegation that will support the conclusion that it was ever the Plaintiff's employer.  The Court also grants Mercy and Accretive's motion to dismiss Count V, but only with respect to the Maine Whistleblowers' Protection Act retaliation claim for monetary damages and attorney's fees, based on the parties' concession that the Plaintiff failed to file her constructive discharge claim in a timely manner as required by Maine law.  The Court denies the motions with respect to the remaining counts.

## I.  BACKGROUND

### A.  Procedural History

On April 29, 2014, Jennifer Worthy filed a sealed qui tam complaint under the False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.*, for and on behalf of the United States of America, and on her own behalf regarding her § 3730(h) retaliation claim, against Mercy Hospital, Mercy Health System of Maine, Eastern Maine Healthcare Systems (EMHS), California Healthcare Medical Billing, Inc. (CHMB), and Accretive Health, Inc. (Accretive).  *Compl. (Filed Under Seal); Demand for Jury Trial; and Req. for Injunctive Relief* (ECF No. 1).  She amended her complaint on August 14, 2014, again filing it under seal.  *First Am. Compl. (Filed Under Seal); Demand for Jury Trial; and Req. for Injunctive Relief* (ECF No. 9).  On January 12, 2015, Ms. Worthy amended her complaint a second time and filed it under seal.  *Second Am. Compl.*

*(Filed Under Seal); Demand for Jury Trial; and Req. for Injunctive Relief* (ECF No. 21). On March 9, 2015, the United States declined to intervene in the action. *United States Notice of Election to Decline Intervention* (ECF No. 24). As a result, the Court ordered that Ms. Worthy unseal the Second Amended Complaint and serve it upon the Defendants. *Order* (ECF No. 27). On January 21, 2016, with consent of all the Defendants, Ms. Worthy amended her complaint for a third time, adding a claim under the Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S. §§ 831 *et seq.* *Third Am. Compl.; Demand for Jury Trial; and Req. for Injunctive Relief* (ECF No. 58) (*TAC*).

As refined by the Third Amended Complaint, Ms. Worthy is making the following claims:

(1)    Count I: FCA against all Defendants for presentation of false claims in alleged violation of 31 U.S.C. § 3729(a)(1)(A);

(2)    Count II: FCA against all Defendants for making or using false record or statement to cause claim to be paid in alleged violation of 31 U.S.C. § 3729(a)(1)(B);

(3)    Count III: FCA against all Defendants for making or using false record or statement to conceal, avoid, and/or decrease obligation to repay money in alleged violation of 31 U.S.C. § 3729(a)(1)(G);

(4)    Count IV: FCA against all Defendants for engaging in a conspiracy to defraud the Government in alleged violation of 31 U.S.C. § 3729(a)(1)(C); and

     (5)     Count V: Unlawful retaliation under the FCA, 31 U.S.C. § 3730(h) and under the MWPA, 26 M.R.S. §§ 831-840.

On March 21, 2016, Mercy Hospital, Mercy Health System of Maine, and EMHS (collectively, the Mercy Defendants) moved for partial dismissal of the Third Amended Complaint. *Mot. of Defs. Mercy Hospital, Mercy Health System of Maine, and Eastern Maine Healthcare Systems for Partial Dismissal* (ECF No. 66) (*Mercy's Mot.*). On the same day, CHMB also moved to dismiss four of the five counts in the Third Amended Complaint. *California Healthcare Medical Billing, Inc.'s Mot. to Dismiss* (ECF No. 67) (*CHMB's Mot.*). Accretive joined Mercy's motion to dismiss Counts I, II, and IV, and separately moved to dismiss Count V. *Def. Accretive Health's Mot. to Dismiss Count V and Joinder in Supp. of Mercy Defs.' Mot. to Dismiss Counts I, II, and IV* (ECF No. 68) (*Accretive's Mot.*). Ms. Worthy objected to the Defendants' motions on May 11, 2016. *Relator's Consolidated Obj. to Defs.' Mots. to Dismiss Third Am. Compl.* (ECF No. 82) (*Pl.'s Opp'n*). On June 10, 2016, each of the Defendants replied. *CHMB's Rely Mem. in Supp. of Mot. to Dismiss* (ECF No. 88) (*CHMB's Reply*); *Am. Reply of Defs.' Mercy Hospital, Mercy Health System of Maine, and Eastern Maine Healthcare Systems in Supp. of Their Mot. for Partial Dismissal* (ECF No. 89) (*Mercy's Reply*); *Def. Accretive Health's Reply in Supp. of its Mot. to Dismiss Count V and Joinder in Supp. of Mercy Defs.' Mot. to Dismiss Counts I, II, and IV* (ECF No. 90) (*Accretive's Reply*).

On June 10, 2016, Ms. Worthy filed a notice of supplemental authority regarding the United States Supreme Court's opinion in *Green v. Brennan*, 136 S. Ct. 1769 (2016). *Pl.'s Notice of Suppl. Authority* (ECF No. 86). On June 23, 2016, the

Defendants also filed a notice of supplemental authority, this one regarding the United States Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). *Defs.' Notice of Suppl. Authority* (ECF No. 93). Ms. Worthy responded to the notice on July 5, 2016. *Pl.-Relator's Resp. to Defs.' Notice of Suppl. Authority* (ECF No. 94).

On August 4, 2016, Ms. Worthy, with the consent of the Defendants, moved for oral argument on the motions to dismiss. *Pl.'s Consent Mot. for Oral Arg. on Mots. to Dismiss* (ECF No. 95). The Court granted the motion for oral argument on the same day. *Order* (ECF No. 96). On December 14, 2016, the Defendants filed a second notice of supplemental authority concerning the First Circuit's decisions in *United States ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103 (1st Cir. 2016) and *Lawton ex rel. United States v. Takeda Pharmaceutical Company, Ltd.*, 842 F.3d 125 (1st Cir. 2016). *Defs.' Second Notice of Suppl. Authority* (ECF No. 103). Ms. Worthy responded on December 22, 2016. *Pl.-Relator's Resp. to Defs.' Second Notice of Suppl. Authority* (ECF No. 104). The Court held oral argument on January 5, 2017. In response to a question by the Court at oral argument, Ms. Worthy filed a second notice of supplemental authority on January 9, 2017 and the Defendants responded on January 12, 2017. *Pl.-Relator's Notice of Suppl. Authority* (ECF No. 106); *Defs.' Resp. to Pl.-Relator's Notice of Suppl. Authority* (ECF No. 109).

**B.    Factual Background**

**1.    The Parties**

Plaintiff/Relator Jennifer Worthy is a resident of Cumberland County in Maine and was employed by Mercy Hospital at its Portland location from November 2, 2012 until February 21, 2014. *TAC* ¶ 9. Ms. Worthy began working at Mercy Hospital as a supervisor of patient accounts and was promoted to the position of manager of patient accounts in August 2013. *Id.* ¶¶ 10-11. Before working for Mercy Hospital, Ms. Worthy had worked for several medical practices as a billing manager for a total of about eleven years. *Id.* ¶ 12. She became a Certified Professional Coder in 2006 after passing a six-hour test and completing 1,600 hours of formal classroom training and two years of on-the-job training. *Id.* ¶¶ 13-14.

Defendant EMHS is a Maine nonprofit, tax-exempt corporation. *Id.* ¶ 23. Effective October 2, 2013, EMHS acquired Mercy Health System of Maine, a Maine nonprofit, tax-exempt corporation, which included Mercy Hospital, a non-profit, tax-exempt hospital in Portland, Maine. *Id.* Mercy Hospital wholly operates numerous physician practices under the name Mercy Medical Associates and provides inpatient and outpatient care in the greater Portland area. *Id.* As a result of this acquisition, Mercy Hospital ultimately became responsible for billing for services provided by the physician practices of Mercy Medical Associates. *Id.* ¶ 24.

Defendant CHMB is a California corporation with its principal place of business in Escondido, California. *Id.* ¶ 19. It provides billing services to medical providers and hospitals, including Mercy Hospital. *Id.*

Defendant Accretive is a Delaware corporation with its principal place of business in Chicago, Illinois. *Id.* ¶ 15. It provides hospital and other medical

providers, including Mercy Hospital, with billing and debt collection services and other revenue management services.  *Id.*

### 2. The Medicare Program

Medicare is a Government program primarily benefiting the elderly created by Congress in 1965.  *Id.* ¶ 37.  Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency that sets standards and regulations for participation in the program.  *Id.*  Medicare Part A primarily covers medical care for patients admitted to the hospital and Medicare Part B primarily covers doctor visits and medical care provided on an outpatient basis.  *Id.*  The Government, through its Medicare program, is one of the principal payers for medical services rendered by Mercy Hospital.  *Id.* ¶ 36.

The Medicare program works by reimbursing health care providers for the cost of services and ancillary items at fixed rates.  *Id.* ¶ 38.  Reimbursements are made out of the Medicare Trust Fund, which is supposed to reimburse only for those services that were actually performed, were medically necessary for the health of the patient, and were ordered specifically by a physician using appropriate medical judgment and acting in the best interest of the patient.  *Id.*  CMS requires healthcare providers to certify that they complied with all laws and regulations.  *Id.* ¶ 39.  The Medicare Trust Fund relies on the implied representation of suppliers of Medicare services that the services billed are compensable under Medicare.  *Id.* ¶ 38.

## II. THE ALLEGATIONS[1]

In her sixty-five page Third Amended Complaint, Ms. Worthy provides background information about the billing and claims submission process at Mercy Hospital. She then sets forth facts alleging several different fraudulent schemes to support her claims in Counts I-IV that the Defendants violated the FCA by submitting false claims and by conspiring to commit that fraud. Additionally, Ms. Worthy alleges facts to support her claim in Count V that the Defendants unlawfully retaliated against her. The alleged facts are copious and dense and the Court has done its best to summarize the allegations below.

### A. Mercy's Billing and Claims Submission Processes

#### 1. Billing Services

In approximately April 2012, Mercy Hospital contracted with Accretive to provide billing, collections, and revenue management services to the Hospital. *Id.* ¶¶ 16, 70. Because Mercy Hospital was struggling financially at the time, it contracted with Accretive with the goals of decreasing the costs of its revenue cycle and increasing its collections. *Id.* ¶¶ 17, 70. As part of its agreement with Mercy Hospital, Accretive agreed to be compensated for its services based on the increase in the Hospital's collections, referred to as "lift." *Id.* ¶¶ 16, 70, 121. Thus, both Accretive and Mercy Hospital received a direct financial benefit from increases in the Hospital's collections. *Id.* ¶¶ 70, 121.

---

[1] In considering a motion to dismiss, a court is required to "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff [ ]." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (quoting *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)).

Accretive employed an "infused management" structure whereby it inserted senior Accretive employees to oversee and manage Mercy Hospital's day-to-day billing and collections operations, including Hospital billing personnel. *Id.* ¶¶ 18, 71. Accretive also implemented several proprietary web-based tools to increase Mercy Hospital's collections, including its Yield Based Follow Up tool (YBFU tool). *Id.* ¶¶ 17, 71. The YBFU tool integrates with a hospital's billing system to track the status and expected reimbursement of unpaid claims, and to prioritize claims for follow-up by hospital billing staff. *Id.* ¶ 72. Accretive represented that the YBFU tool would both shorten the revenue cycle–that is, the time in which Mercy Hospital was paid for claims that it submitted to insurers–and increase Mercy Hospital's collections. *Id.*

In about early 2013, Mercy Hospital also decided to contract with CHMB to perform the billing services for the Hospital and its wholly-owned and wholly-operated physician practices. *Id.* ¶ 19. Under its contract with Mercy Hospital, CHMB receives as compensation 3% of the gross collections from Mercy Medical Associate's physician practices. *Id.* ¶ 21. CHMB made frequent site visits to Mercy Hospital and integrated its billing operations into Mercy Hospital's patient accounts department. *Id.* ¶ 22.

## 2. Claims Submission Process

Mercy Hospital used an electronic health records system (Meditech) to document the services it provided to patients. *Id.* ¶ 75. In order to bill Medicare for services, Mercy Hospital's professional coders accessed the electronic health record in Meditech, analyzed the medical documentation associated with the services provided

to the patient, and assigned codes that reflected those services as well as the diagnosis. *Id.* Once the coder finished assigning codes based upon the medical documentation, the codes were electronically routed to Mercy Hospital's billing department. *Id.* ¶ 76. Based upon the codes assigned by the coder, Mercy Hospital's billers then formulated the bill, and initiated the process by which a claim was electronically submitted to Medicare. *Id.* Billers then electronically submitted Medicare claims to a computer system known as the Fiscal Intermediary Standard System (FISS), the single standard Medicare Part A claims processing system used to process Medicare claims related to medical care provided by hospital and hospital based providers. *Id.* ¶ 77.

The FISS system utilized a system of "edits" intended to promote correct coding of claims submitted to Medicare and to prevent inappropriate payment. *Id.* ¶ 78. Claim edits work by using automated edits to compare submitted Medicare claims to a defined set of criteria, in order to identify irregularities and prevent inappropriate payment. *Id.* When irregularities are identified, payment is stopped and the claim is returned to the provider for review. *Id.* Coding changes, made in response to edits, may then be made only if the clinical circumstances justify the change in coding and not solely to bypass a Medicare edit. *Id.*

## B.   False Modification and Resubmission of Claims That Had Been Stopped by Medicare

After it was integrated into Mercy Hospital's billing system in February 2013, the YBFU tool tracked and compiled claims submitted by Mercy for which Mercy had not received compensation, including claims that had been stopped due to the

operation of Medicare edits, and ranked these claims based on dollar amount, payer, and length of time the claim had gone unpaid. *Id.* ¶ 79. The highest priority Medicare claims–claims in excess of $25,000 that were unpaid after 21 days–were classified as Risk 1. *Id.* When ranking unpaid claims, the YBFU tool did not differentiate unpaid claims for which the Hospital was actually entitled to compensation from those that involved non-payable charges. *Id.* ¶ 80.

Instead of limiting themselves to identifying and correcting claims with legitimate errors, at daily huddles and during SWAT team meetings, Accretive staff members, including Jessica Martin, Brie Farmer, and Anvita Kumar, instructed Mercy Hospital billers on how to manipulate claims that Medicare legitimately held from payment by clearing Risk 1 claims in order to get those claims paid. *Id.* ¶¶ 81-84. The methods Accretive instructed Mercy billers to employ included systematically (1) unbundling claims that were required by Medicare payment rules to be bundled together for single payment; and (2) deleting and otherwise omitting accident and injury information in order to obtain payment of claims which Medicare held from payment in accordance with Medicare Secondary Payer (MSP) procedures. *Id.* ¶ 67. Ms. Worthy contends that as a result of these practices, Accretive and Mercy Hospital received overpayments from Medicare, which the Defendants did not report or return within the specified time period under the regulations. *Id.* ¶ 69.

### 1. Unbundling Claims to Bypass Edits and Increase Payment

"Unbundling" refers to the practice of billing separately for a group of procedures that are covered by a single comprehensive billing code. *Id.* ¶ 87.

Intentional unbundling occurs when providers manipulate billing codes in order to maximize payment and otherwise bypass Medicare payment controls. *Id.* CMS has long identified unbundling as a common type of Medicare fraud. *Id.* ¶¶ 63, 87. Accretive instructed government team billers to unbundle claims in two primary ways: (a) through the false addition of -59 modifiers and (b) through the false addition of G0 condition codes. *Id.* ¶ 88.

### a.  False Addition of -59 Modifiers

Medicare requires that certain services, when performed together on the same individual, be bundled into one comprehensive charge rather than charged and paid separately. *Id.* ¶ 58. The payment for the bundled code includes payment for the individual services included within the Current Procedural Technology (CPT) code. *Id.* Under certain circumstances, a provider may need to indicate that a procedure or service was separate or distinct from other services performed on the same day. *Id.* ¶¶ 60, 90. Modifier -59 is appended to a bundled CPT code to identify procedures or services that are normally bundled, but are correctly being billed as separate services in that instance. *Id.* ¶¶ 60, 91. Modifier -59 may be appended to a lesser-included procedure or service if the service represented a different patient encounter or session, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or a separate injury not ordinarily encountered or performed on the same day by the same physician. *Id.* ¶¶ 61, 91. Clinical documentation must support the use of the Modifier -59 and this modifier should

never be used strictly to prevent a service from being bundled or to deceive the Medicare claims processing system. *Id.* ¶¶ 62, 92.

Accretive personnel, acting with the authority of Mercy management, instructed Mercy's billers to bypass Medicare's edits by systematically retracting claims and adding -59 modifiers without a lawful basis to do so and without reference to clinical documentation. *Id.* ¶ 93. By instructing billers to regularly add the -59 modifier to claims without a legitimate basis to do so, Accretive caused claims to be submitted for multiple separate services that were legally required to be paid at a lower, bundled rate and that otherwise would have been paid at the lower rate. *Id.* Ms. Worthy repeatedly witnessed and objected when Accretive Revenue Cycle Analyst Jessica Martin ordered the use of a -59 modifier without a legitimate basis and solely to cause Medicare to pay more than it should. *Id.* ¶ 94.

### b. False Addition of G0 Condition Codes

Hospitals report condition code G0 when a patient has multiple medical visits on the same day at the same revenue center, but the visits are for distinct, unrelated medical conditions. *Id.* ¶¶ 56, 95. The G0 code bypasses Medicare's audit system and certifies that the billed services are unrelated, separate services eligible to be paid separately and not as part of a packaged payment. *Id.* ¶¶ 57, 95.

Accretive and Mercy Hospital falsely reported the G0 condition code for related claims to bypass Medicare edits, resulting in Medicare payment of duplicate facility fees for related medical conditions that should have been bundled together. *Id.* ¶ 96.

As a result of the addition of false G0 codes, Medicare paid more for individual claims than it was legally required to pay. *Id.*

### 2. Deleting Accident and Injury Information from Claims Billed to Medicare in Violation of the MSP Provision

The MSP provisions provide that, under certain conditions, Medicare will be the secondary rather than primary payer for its beneficiaries. *Id.* ¶ 64. Under the MSP provisions, Medicare is precluded from making payment for services to the extent that payment has been made or can reasonably be expected to be made promptly under (1) worker's compensation, (2) liability insurance, or (3) no-fault insurance. *Id.* ¶¶ 64, 98. To participate in the Medicare program, providers must agree to bill other primary insurers before billing Medicare. *Id.* ¶ 65. A provider is only permitted to seek conditional payment from Medicare if it first billed the claim to the worker's compensation, liability, or no-fault insurer and it either did not receive payment at the end of the 120-day prompt period or has evidence that payment will not be made by the primary insurer within the 120-day prompt period. *Id.* ¶ 99. Medicare regularly withholds payments on accident or injury claims in order to determine whether there exists a primary insurer other than Medicare. *Id.* ¶ 100.

There exist several means by which a claim may indicate to Medicare that an accident or injury occurred, thereby triggering Medicare's withholding of payment pending an inquiry and determination of primary insurance. *Id.* ¶ 101. One such method is inclusion on the claim of an external cause of injury code (E code), an ICD-9 diagnosis code that describes the cause of an injury, incident, or illness. *Id.* Other methods include completion of specific line items–10a, 10b, and 10c–on the CMS-1500

claim form to indicate that the patient's condition was employment or accident related. *Id.*

To bypass the internal controls in Medicare's MSP determination process so that Medicare would believe itself to be the primary insurer, Accretive employees instructed and pressured Mercy Hospital government team billers to retract and remove accident and injury information, including E codes–information which had previously been assigned to claims by coders based upon review of clinical documentation–from Risk 1 claims in FISS, without regard to whether another payer was responsible for paying the claim. *Id.* ¶ 104. Additionally, to accelerate payment of Risk 1 claims billed to a worker's compensation, liability, or no-fault insurer which had not been paid within the expected YBFU time frame, Accretive instructed Hospital billers to create new claims without any accident or injury information–without E codes and with the answers to boxes 10a, 10b, and 10c of the CMS-1500 form switched from "yes" to "no"–and to bill these claims to Medicare rather than wait and conditionally bill Medicare at the end of the 120-day prompt period. *Id.* ¶ 105. For instance, in spring 2013, Ms. Worthy reviewed copies of unpaid Risk 1 claims that Accretive staff instructed a Mercy biller (AW) to submit to Medicare without accident or injury information in order to get the claim through the Medicare system. *Id.* ¶ 107. In this way, Defendants were able to improperly receive payment from Medicare on claims Medicare was not obligated to pay. *Id.* ¶ 106.

### 3. Ms. Worthy Observed and Reported Submission of False Diagnosis & Billing Codes

During this time, members of Mercy's billing staff began raising concerns about Accretive's practices. *Id.* ¶ 111. These billers informed Ms. Worthy of the pressure that the billing staff–particularly, the government team billers–received from Accretive every day to manipulate coding and clear high-value Medicare claims. *Id.* Ms. Worthy's personal observations heightened her concerns about the submission of false claims; specifically, she witnessed Accretive staff pressuring and directing government team billers to resubmit Medicare claims within FISS without accessing underlying clinical documentation or communicating with coders to ensure that changes were clinically warranted. *Id.* ¶ 112. This was evidenced not only in routine meetings between Accretive and billing staff, but also when Accretive managers stood at the cubicles of government team billers and gave specific instructions on how to modify the claims. *Id.* On more than one occasion, Ms. Worthy overheard Jessica Martin of Accretive instruct a government team biller to add -59 modifiers to unbundled procedures to bypass Medicare edits. *Id.* ¶ 113.

Ms. Worthy's concerns were corroborated by her review of specific Medicare claims, and the patterns of changes she observed to unpaid Medicare claims in FISS, all of which confirmed what she had personally observed and what had been relayed to her by the billing staff. *Id.* ¶ 114. Specifically, in the fall of 2013, after recognizing a drastic increase in the number of claims that had been suspended or returned by Medicare, Ms. Worthy began receiving reports that listed FISS claims, sorted by the reason that the claim had been returned by Medicare. *Id.* ¶ 115. In reviewing these reports, Ms. Worthy, along with another Mercy biller (TH), were able to identify

patterns of changes made to high-value claims in FISS by members of Mercy Hospital's government team, including the deletion of E-codes and the addition of G0 codes and -59 modifiers. *Id.* ¶ 116. The frequency of these changes substantially exceeded what Ms. Worthy and TH expected, based upon their experience, and these changes were particularly concerning given that the billing staff no longer maintained access to clinical coding information. *Id.*

In addition, Ms. Worthy reviewed specific Medicare claims that had been returned for failing edits, changed in the FISS system at the direction of Accretive, and subsequently paid by Medicare. *Id.* ¶ 117. This was accomplished by identifying high-value claims that Medicare had returned or suspended based upon the fiscal intermediary's internal controls; examining the electronic claim in FISS to determine what changes were made to the coding after the claim had been returned; comparing the coding changes to the documentation in the Meditech system; and subsequently, determining whether the changed claim had been paid by Medicare. *Id.* In numerous instances, the final FISS claim was no longer consistent with the billing information contained in Meditech. *Id.* For example, in approximately December 2013, Ms. Worthy observed information provided by TH that revealed a pattern of questionable coding changes made in the FISS system by DD, a member of the government billing team. *Id.* ¶ 118. These changes included the systematic deletion of E codes from potential MSP claims. *Id.* Ms. Worthy questioned DD regarding the coding changes he made in FISS; DD responded that the changes were made at the direction of Accretive personnel. *Id.*

Ms. Worthy reported her concerns to Mercy Hospital Coding Manager Shonda Menezes and Accretive Director of Revenue Cycle Judi Kieltyka. *Id.* ¶ 119. She also spoke with Brie Farmer, Anvita Kumar, and Jessica Martin from Accretive and voiced her concerns that the coding changes made at their direction were false. *Id.* Nonetheless, Accretive and Mercy Hospital continued to use the YBFU tool to identify high-value, unpaid claims and then resubmit false codes for high-dollar Risk 1 claims. *Id.* Ms. Worthy further reported the deletion of accident and injury codes in a meeting with Mercy Hospital Chief Medical Officer Scott Rusk, Ms. Kieltyka, and Mercy Hospital Senior Vice President and Chief Financial Officer Michael Hachey. *Id.* ¶ 120. This meeting did not result in any changes. *Id.*

## C. Accretive Instructed Staff to Falsify Patient Discharge Status Indicators to Increase Reimbursement

Medicare pays for acute inpatient care in hospitals through the Inpatient Prospective Payment System (IPPS). *Id.* ¶ 41. Hospitals receive a predetermined rate for each discharge or each case, instead of billing Medicare for individual services provided during the patient's hospital stay. *Id.* The payment rate under the IPPS is determined by the patient's principal diagnosis upon discharge and any secondary diagnoses, comorbidities, complications, procedures performed during the hospital stay, and discharge status. *Id.* ¶ 42. Based on these factors, a patient is assigned to a diagnosis-related group (DRG). *Id.* Each discharge is assigned only one DRG, regardless of the number of conditions treated or services furnished during the patient's stay. *Id.* The payment for each DRG is based on the expenses associated

with the patient's condition and treatment, and the hospital's capital and operating costs. *Id.*

Under Medicare's IPPS, when a patient is discharged from the hospital, the hospital indicates the patient's discharge status to Medicare as part of its claim for reimbursement. *Id.* ¶ 123. The discharge status indicates where the patient is being discharged to, such as a skilled nursing facility or the patient's home. *Id.* If a patient is discharged from the hospital to a skilled nursing facility, the hospital and the skilled nursing facility share in the reimbursement. *Id.* By contrast, if a patient is discharged to his or her home, the hospital gets the entire reimbursement amount. *Id.* Therefore it is to the hospital's financial advantage to have the discharge status indicator be "discharge to home" because the hospital's reimbursement amount from Medicare is greater. *Id.*

Beginning in 2012, Ms. Martin created a spreadsheet each quarter listing Medicare claims that had been submitted with a discharge status indicator other than "discharge to home" and noting the difference in reimbursement for Mercy Hospital if the listed claims had "discharge to home" status indicators rather than their current discharge status indicator. *Id.* ¶ 124. Ms. Martin provided Ms. Worthy with the discharge indicator spreadsheet every quarter from July 2013 until the end of her employment in February 2014. *Id.* ¶ 125.

In July 2013, Ms. Martin provided Ms. Worthy with the discharge indicator spreadsheet for Q1 2013 and instructed her to enter the FISS system, retract the claims, change the discharge status indicator to "discharged to home" and resubmit

the claims so that Mercy Hospital would receive a greater DRG payment. *Id.* ¶ 126. Ms. Martin later provided Ms. Worthy with the discharge status indicator spreadsheet from Q2 2013 with the same instructions. *Id.* Because Accretive did not have its own access to FISS, only a Mercy Hospital employee with access to FISS could change the discharge status indicators on those claims. *Id.*

Ms. Worthy was concerned about the appropriateness of this practice and believed these changes should be made by Mercy Hospital's coding department based on medical documentation. *Id.* ¶ 127. However, when Ms. Worthy sent the spreadsheet to Ms. Menezes of the coding department and asked her why a professional coder was not handling the discharge status indicator changes, Ms. Menezes informed her that the coding department was not supposed to make the changes based on Accretive's instructions. *Id.* After speaking with Ms. Menezes, Ms. Worthy investigated the electronic medical records in Meditech associated with approximately seventy of the claims listed in the Q1 and Q2 2013 spreadsheets she was provided, and found that there was no documentation, such as an addendum or telephone record, which supported changing the discharge status indicator on the claims as Accretive demanded. *Id.* ¶ 128. Ms. Worthy observed that the claims listed on the spreadsheets were for high-value DRGs and that each spreadsheet indicated that Mercy Hospital and Accretive would receive an increase of approximately $100,000 in Medicare reimbursement by changing the discharge status indicator on the claims. *Id.*

Ms. Worthy refused to falsify the discharge status indicators in accordance with Accretive's instructions or to allow her staff to do so. *Id.* ¶ 129. She also met with Ms. Martin and Ms. Kieltyka of Accretive to express her concerns about the practice. *Id.* Ms. Kieltyka and Ms. Martin dismissed Ms. Worthy's objections, stating that this was a "best practice" that Accretive implemented at other client hospitals and that Mercy Hospital would be "leaving money on the table" if she did not do this. *Id.* Because Ms. Worthy refused to falsify these claims in accordance with Accretive's instructions, upon information and belief, after Ms. Worthy's employment with Mercy Hospital ended, Mercy Hospital biller TH changed and resubmitted the claims listed on the Q1 and Q2 2013 spreadsheets with false discharge status indicators based on the instructions of Ms. Martin and Ms. Kieltyka. *Id.* ¶ 130. Upon information and belief, under the direction of Ms. Martin and Ms. Kieltyka, TH also changed the discharge status indicators of Medicare claims listed on the Q3 2013, Q4 2013, and Q1 2014 spreadsheets. *Id.*

### D. Fraudulent or Duplicative Billing for Facility Fees Within Three-Day and Same-Day Billing Windows

The three-day payment window or "Three-Day Rule," is designed to prevent multiple claims for facility fees when a patient receives medical treatment at more than one facility operated by the same hospital. *Id.* ¶ 47. Under the Three-Day Rule, if a hospital or entity wholly operated by a hospital provides outpatient services to a patient in the three days prior to an inpatient hospital stay, the technical component, which covers the cost of equipment and supplies for a service, or facility fee for those services, must be bundled with the claim for the inpatient stay and not separately

billed. *Id.* ¶ 48. Similarly, any diagnostic services within the three-day window, and any non-diagnostic services that are clinically related to the reason for the patient's hospital admission, must be bundled with the claim for the hospital stay. *Id.*

Additionally, Medicare pays for outpatient care for beneficiaries through its Outpatient Prospective Payment System (OPPS). *Id.* ¶ 51. Under the OPPS, Medicare pays predetermined amounts for designated services. *Id.* Medicare classifies outpatient services into ambulatory payment classifications (APCs). *Id.* ¶ 52. APCs group procedures together that are clinically similar and use a similar amount of resources so that comparable procedures receive comparable reimbursement rates. *Id.* APC payments include overhead and supplies, which cannot be billed separately under OPPS. *Id.* ¶ 53. Items and services that must be included as packaged cost items and not billed separately from services include, but are not limited to: use of operating room, procedure or treatment room, recovery room, and observation services; medical supplies including surgical supplies and equipment, certain pharmaceuticals, surgical dressings, substitute skin products and other products that aid wound healing; supplies and equipment related to anesthesia or sedation; certain clinical diagnostic tests; and durable medical equipment that is implantable. *Id.* ¶ 54. When multiple claims for certain outpatient services occur on the same day, Medicare regulations require that these claims be packaged together under the "Same-Day Rule" to avoid overpayment for the fixed costs that are incorporated into the payment for that APC. *Id.* ¶ 55.

**1.** **Defendants' Scheme to Submit False Claims in Violation of Same-Day and Three-Day Rules**

On about April 17, 2013, representatives from CHMB, including its owner, Janet Boos, and its account executive for Mercy Hospital, Michelle Pena, visited Mercy Hospital to discuss billing procedures. *Id.* ¶ 134. The CHMB representatives met with, among others, Accretive's Judi Kieltyka, and Mercy's Michael Hachey, Vice President of Physician Practices Judi Hawkes, Chief Information Officer Craig Dreher, and Ms. Worthy. *Id.* During the April visit, the CHMB representatives did not spend any time reviewing claims processing or the process by which Mercy Hospital reviewed claims and ensured their accuracy. *Id.*

Based upon comments by the CHMB representatives during the April 2013 visit, Ms. Worthy became concerned that CHMB was unfamiliar with the Three-Day and Same-Day Rules and began to raise questions internally. *Id.* ¶ 135. The Hospital executives assured her that CHMB had experience with provider-based billing for Medicare and had several hospital clients. *Id.* Ms. Worthy raised similar concerns at a subsequent meeting on June 19, 2013, and again in an email to representatives from CHMB, Accretive, and Mercy. *Id.* ¶¶ 136, 138. She received no response. *Id.* ¶ 138.

Before August 1, 2013, Mercy Hospital used Meditech billing software to process all of its hospital and physician billing, thereby ensuring that all facility billing was bundled in a single claim in compliance with Medicare's legal requirements. *Id.* ¶ 140. When CHMB assumed responsibility for the billing of claims for Mercy Hospital's wholly-owned physician practices, it used a different software, Allscripts, to process all physician-practice claims including both facility

fees and professional fees. *Id.* Allscripts was not integrated with and did not communicate with Meditech. *Id.* Because Allscripts would miss all claims subject to the Same-Day and Three-Day Rules, Defendants knew that CHMB needed to manually check all physician practice claims for the date of service to ensure that these claims complied with the three-day and same-day billing requirements. *Id.* Defendants did not conduct this manual review after CHMB assumed responsibility for billing for the wholly owned and operated physician practices. *Id.*

Before taking over responsibility for billing for the physician practices and with knowledge that they would bill in violation of the Same-Day and Three-Day Rules, Ms. Worthy alleges on information and belief that CHMB conducted no testing of its billing system to ensure compliance with Medicare regulations, even after she and others raised concerns. *Id.* ¶ 141. Senior leadership at Mercy Hospital, including but not limited to Michael Hachey, Judi Hawkes, Craig Dreher, and Ms. Worthy, and Judi Kieltyka from Accretive met biweekly as part of the Committee on Revenue Excellence (CORE). *Id.* ¶ 142. At a CORE meeting on August 21, 2013, Ms. Worthy reminded those present, including but not limited to Mr. Hachey, Ms. Hawkes, Mr. Dreher, and Ms. Kieltyka, that CHMB still had no plan in place for complying with Medicare billing regulations. *Id.*

## 2. CHMB Takes Over Billing with Knowledge of Problems

CHMB assumed responsibility for the Mercy Hospital outpatient physician practice billing on August 1, 2013, despite knowing it was not prepared to handle Mercy's Medicare billings in a compliant manner. *Id.* ¶ 143. Based on concerns about

CHMB's ability to submit Medicare bills in a compliant manner, Ms. Kieltyka instructed CHMB to hold all Medicare billing until a process was in place to ensure compliance with Medicare regulations. *Id.* ¶ 144. At an August 21, 2013 CORE meeting, approximately three weeks after CHMB took over Medicare billing responsibilities, Ms. Worthy informed the group that CHMB was now holding about $750,000 in Medicare billings on behalf of Mercy Hospital, about 60% of which was tainted by unlawful facility charges that were not bundled as required by the Same-Day and Three-Day Rules. *Id.* ¶ 145.

In early September 2013, Ms. Worthy accessed the FISS system and determined that CHMB was not holding billings as directed but actually had received about $1 million in Medicare reimbursements on behalf of Mercy Hospital. *Id.* ¶ 147. Ms. Worthy determined that contrary to Ms. Kieltyka's directions, CHMB was billing and receiving payment from Medicare for office visits and other medical services subject to the Same-Day and Three-Day Rules. *Id.* ¶ 148. She further observed that while claims to Medicare submitted by CHMB were increasing, Mercy Hospital's accounts receivable was decreasing. *Id.* Ms. Worthy reported the apparent Medicare overbilling violations to Ms. Kieltyka at Accretive. *Id.* ¶ 149. She received no response to her reports. *Id.* CHMB officials Janet Boos, Michelle Pena, and Paula Kacsir (a CHMB Vice President of Client Services who was assigned to the Mercy Hospital account in the fall of 2013) all subsequently denied that CHMB was submitting Medicare claims on behalf of Mercy Hospital and asserted that CHMB was holding all Medicare claims as instructed. *Id.* ¶ 150. In fact, CHMB was

receiving Medicare payments and posting them to accounts at this time, but falsely represented to Accretive and Mercy that it was holding Medicare billings. *Id.* ¶¶ 150-51.

### 3. Creation of Dummy Accounts to Conceal Same-Day and Three-Day Violations

In December 2013, Ms. Worthy did an analysis of two weeks of the claims submitted by CHMB using the FISS system. *Id.* ¶ 152. She noticed that CHMB first billed Medicare for services in violation of the Same-Day and Three-Day Rules. *Id.* ¶ 155. Medicare then paid CHMB for the claims. *Id.* After receiving payment for the claim, CHMB was supposed to pass the payment on to Mercy Hospital. *Id.* ¶ 156. Instead, once CHMB received payment, CHMB voided the correct patient account, and created a dummy account under a different name. *Id.* It then posted the payment received to Medicare to the dummy account for the same dollar amount and CPT code as the original claim. *Id.* Ms. Worthy was able to determine through the FISS system that CHMB was not billing Medicare for these dummy accounts, having already billed Medicare under the correct patient account. *Id.* ¶ 159.

The voiding of patient accounts and creation of dummy accounts, which was internal to CHMB and not reported to Medicare, allowed CHMB to falsely represent to Accretive and Mercy Hospital that it had not violated the Same-Day or Three-Day requirements. *Id.* ¶ 157. The dummy accounts also served to falsely inflate Mercy Hospital's accounts receivable and hampered any future attempts at audits or repayments for violations of the Same-Day or Three-Day Rules because the payment now appeared under another patient's name. *Id.* ¶ 159.

Tyler Chase and Richard Moulton, who work for Mercy Hospital Information Services, attempted to run an audit trail on the Allscripts computer system to determine who entered the voids and payments. *Id.* ¶ 160. They determined that CHMB had created the dummy accounts but, because an anonymous computer user had set up the dummy accounts, they could not link the creation of the dummy accounts to a specific Mercy Hospital, Accretive, or CHMB employee. *Id.* In particular, Mr. Chase informed Ms. Worthy that there were 112 vouchers in CHMB's Allscripts system that had a "no charge" listing, indicating that there were no services in the account to be billed. *Id.* ¶ 161. Mr. Chase discovered that approximately sixty of these "no charge" accounts had payments posted, totaling approximately $6,000. *Id.* These payments had been entered by a user called "chmb401" which had entered more payments into Allscripts than any other user–approximately 23% of all payments for over $120,000. *Id.* Mr. Chase noted that this username could be an automated or shared login within CHMB rather than the username of a particular individual, which would make an audit trail much harder. *Id.*

### 4.    Ms. Worthy Reports CHMB's Fraudulent Overbilling

After Ms. Worthy reported the apparent Medicare overbilling violations to Ms. Kieltyka in early September 2013, representatives of CHMB abruptly and without explanation refused to communicate with her. *Id.* ¶ 163. In late September 2013, after Ms. Worthy had reported her concerns to Ms. Kieltyka and received no response from her, she emailed Peter Angerhoffer, Accretive's Senior Vice President for New England, and asked to speak with him. *Id.* ¶ 164. She told him that the overbilling

was exposing Mercy Hospital and Accretive to liability, both from a compliance and Medicare cash standpoint. *Id.* Ms. Worthy asked Mr. Angerhoffer to intervene and Mr. Angerhoffer promised to resolve the problem. *Id.*

Ms. Worthy continued to monitor the FISS system throughout September and October and saw that CHMB was continuing to submit and resubmit claims to Medicare in violation of the Same-Day and Three-Day Rules. *Id.* ¶ 165. In about October 2013 Ms. Worthy began providing Mr. Hachey and Ms. Kieltyka with daily reports about the Medicare billing violation problems. *Id.* ¶ 166. Mr. Hachey repeatedly directed Ms. Worthy back to Ms. Kieltyka even though Mr. Hachey knew that Ms. Kieltyka was not pursuing a resolution in compliance with the Medicare Claims Processing Manual. *Id.* On October 15, 2013, Mr. Hachey convened a meeting with Ms. Hawkes, Mr. Dreher, Ms. Kieltyka, Ms. Worthy, and CHMB President Janet Boos (who participated by telephone). *Id.* ¶ 167. By that date, Ms. Worthy had reported her concerns about violations of Medicare's Same-Day and Three-Day Rules at least a dozen times to Accretive executive Judi Kieltyka and Mercy Hospital executives, including Mr. Hachey. *Id.* During the conversation, Ms. Boos committed to recruiting someone familiar with provider-based billing to work as a resource for CHMB. *Id.*

At the CORE meeting on October 16, 2013, Ms. Worthy presented documentation proving the Medicare billing violations and the large volume of the improper claims. *Id.* ¶ 168. She further advised the attendees that although there is a 60-day grace period to correct erroneous Medicare billing, 75 days had now gone

by, making CHMB's illegal billing a compliance issue. *Id.* In response, Mr. Hachey proposed to convene a task force composed of himself, Ms. Hawkes, Ms. Kieltyka, Mr. Dreher, Ms. Hawkes's assistant Marybeth Winschel, and Ms. Worthy to attempt to resolve the illegal billing. *Id.* The task force met on October 17, 2013. *Id.* ¶ 169. At the meeting, Ms. Kieltyka warned Ms. Worthy not to make any more statements about improper Medicare billing by CHMB at the biweekly CORE meeting. *Id.* Ms. Worthy advised the task force that representatives of CHMB were not speaking with her and that the actual financial numbers could not be reconciled with CHMB's claim that it had a Medicare hold still in place. *Id.* At a CHMB site visit in San Diego, California on October 30, 2013, Ms. Worthy again questioned Ms. Kieltyka for an explanation, but Ms. Kieltyka never responded. *Id.* ¶ 170. In early November 2013, Ms. Worthy met with Mr. Angerhoffer and again raised the concerns she had raised with him previously about the illegal Medicare overbilling. *Id.* ¶ 171.

On November 25, 2013, CHMB Vice President Paula Kacsir stated that CHMB had resubmitted a large claim to Medicare on behalf of Mercy Hospital's physician practices. *Id.* ¶ 172. She claimed that the need to resubmit the claims was due to an "internal" error by Medicare. *Id.* However, because the Hospital appeared to continue receiving reimbursement without interruption for its own billing, Ms. Worthy told Ms. Kieltyka that something was amiss. *Id.* In Ms. Worthy's experience, if there was an error on Medicare's part, CMS would not tell a provider to resubmit a claim. *Id.* Accordingly, she concluded that Ms. Kacsir's explanation of an "internal" error was improbable and it was more likely that CHMB had erred. *Id.* This false

explanation by CHMB demonstrated to Ms. Worthy that–even four months after assuming responsibility for billing for the Mercy Hospital physician practices–CHMB still was filing fraudulent facility charges. *Id.*

Ms. Hawkes had maintained that Mercy Hospital had "special" Medicare considerations that did not apply to hospitals on the West Coast where CHMB had contracts to provide billing services. *Id.* ¶ 173. At a Medicare Billing Compliance Boot Camp on or about December 2, 2013 Ms. Worthy confirmed with Hugh Aaron, JD, MHC, an expert trainer at the meeting, that Ms. Hawkes's explanation could not be true and that the only exceptions to the Same-Day and Three-Day Rules were three critical care hospitals in Maryland, tribal hospitals, long-term critical care hospitals, and hospitals in Guam, the US Virgin Islands, the Marianas, and American Samoa. *Id.* ¶ 174. Ms. Worthy telephoned Ms. Kieltyka that night and detailed her conversation with the trainer. *Id.* ¶ 175. Ms. Kieltyka concurred and said she had raised the same questions with CHMB and Ms. Hawkes, yet Ms. Kieltyka and Accretive did nothing to stop CHMB's billing of Medicare in violation of the Same-Day and Three-Day Rules. *Id.* When Ms. Hawkes continued to falsely claim that Mercy was "different" at the CORE meetings in December and January, Ms. Worthy challenged her but received no response. *Id.*

On December 4, Ms. Worthy emailed Ms. Boos asking if CHMB had identified someone to assist it with compliance with the Same-Day and Three-Day Rules. *Id.* ¶ 176. Ms. Boos never responded. *Id.* On January 7, 9, and 10, Ms. Worthy spoke with Ms. Kieltyka and Ms. Pena at CHMB about her findings regarding the dummy

accounts. *Id.* ¶ 177. Ms. Pena admitted during the conversations that the dummy accounts were "placeholders" for the improper payments CHMB received from Medicare. *Id.* When questioned further by Ms. Worthy about how refunds to Medicare would be identified due to the creation of these dummy accounts, Ms. Pena admitted that the practice was improper. *Id.*

### 5. Defendants' Response to Ms. Worthy's Reports

On December 12, 2013, with no progress having been made on resolving the Medicare billing violation issues over eight months after Ms. Worthy initially raised them, Mr. Hachey convened a work group consisting of CHMB's Ms. Boos, Ms. Pena, and Ms. Kacsir by phone; Mercy personnel Ms. Worthy, Ms. Hawkes, Marybeth Winschel and Ms. Menezes; and Accretive's Ms. Kieltyka to further address the issue. *Id.* ¶ 178. During the December 12, 2013 conference call Ms. Boos admitted for the first time that CHMB in fact had been billing claims to Medicare back to August 1, 2013, the date it took over responsibility for billing for the Mercy physician practices, and that it had submitted mass rebills on October 28 and December 11. *Id.* ¶ 179. Ms. Boos attributed the errors to CHMB's technology, even though Ms. Worthy had warned the Defendants about the fraudulent billing. *Id.*

On January 9, 2014, Ms. Worthy filed an internal complaint about the Medicare billing violations with Jean Eichenbaum, Mercy Hospital's compliance officer. *Id.* ¶ 180. She informed Ms. Kieltyka that she had filed a complaint about the illegal billings. *Id.* Ms. Eichenbaum directed Ms. Worthy to contact Maggie Fortin, a Medicare Subject Matter Expert employed by the accounting firm Baker,

Newman & Noyes. *Id.* ¶ 181. Ms. Fortin conducted an investigation and met onsite with Ms. Kieltyka, Ms. Worthy, and Ms. Menezes; she reviewed the process in place and looked into Ms. Worthy's allegations by an audit of 835 Medicare electronic payment remittances and prepared a report for Mercy Hospital. *Id.* ¶ 182. Although Ms. Fortin did not provide a copy of her report to Ms. Worthy, Ms. Fortin orally told her that she agreed with her conclusions about the improper Medicare billing and receipt of funds. *Id.* ¶ 183. Ms. Fortin warned Ms. Kieltyka in person and in the presence of Ms. Worthy and Ms. Menezes that Medicare guidelines prohibited the separate claim submission by the Hospital and its physician practices on services rendered that fell under the Same-Day and Three-Day Rules. *Id.*

### 6. Defendants Deliberately Concealed Their Fraudulent Billing

Following the January 14, 2014 meeting with Ms. Kieltyka, Ms. Worthy continued to report to Mr. Hachey and Ms. Kieltyka about the Medicare overbilling violations. *Id.* ¶ 184. She also instructed Ms. Kumar, Accretive's senior operations leader for patient accounts, to prepare a "dashboard" of accounts receivable metrics for the CORE meeting scheduled for January 22nd to graphically demonstrate the Medicare billing violations by CHMB. *Id.* Following this conversation with Ms. Kieltyka, plans to create the dashboard were cancelled. *Id.* Upon learning of Ms. Worthy's plan to present the graphic information about Medicare billing violations at the upcoming CORE meeting, Ms. Kieltyka directed her by phone not to do so. *Id.* ¶ 185. Ms. Worthy questioned why she could not do so and complained that eight months had passed and the Medicare billing violations still had not been corrected.

*Id.* Ms. Kieltyka responded in a demeaning fashion that Ms. Worthy was inexperienced and there was "no appropriate audience" at CORE. *Id.* The January 22nd meeting was later cancelled. *Id.*

A few days after Ms. Worthy gave her notice of resignation, Mr. Hachey requested and Ms. Worthy provided a detailed description of the Medicare billing violations. *Id.* ¶ 186. On about February 21, 2014 Ms. Worthy reported to Mr. Hachey by email that CHMB continued to receive erroneous payments following the last confirmed claim run of February 6, 2014 and that Ms. Kieltyka had signed the Fourth Quarter 2013 Medicare Credit Balance report knowingly omitting the overpayments. *Id.* ¶ 187. In addition to the cancellation of the scheduled January 22nd CORE meeting, Ms. Kieltyka and Mr. Hachey also cancelled future CORE meetings until after Ms. Worthy had stopped working at the Hospital, thereby precluding her from presenting her concerns about the illegal billing to Ms. Kieltyka, Mr. Hachey, Ms. Hawkes, Mr. Dreher, and others as a group. *Id.* ¶ 188.

### E.    CHMB Submitted False Claims to Medicare in Violation of Same-Day and Three-Day Rules

By virtue of her position as patient account manager, Ms. Worthy had direct, first-hand knowledge that CHMB, on behalf of the Hospital, billed and received payment from Medicare for duplicative, unbundled claims in violation of Medicare's Three-Day and Same-Day Rules. *Id.* ¶ 189. For instance, CHMB billed Medicare $73.91 for a December 17, 2013 outpatient clinic office visit (CPT 99213) which Medicare paid on January 10, 2014. *Id.* ¶ 190. This claim should have been bundled with Mercy Hospital's claim (#AH0003256198) for an x-ray (CPT 71020) and an office

visit (CPT 99214) for the same patient on the same date of service. *Id.* CHMB also

billed Medicare for the following other claims in violation of the Same-Day Rule:

- CHMB claim #14103860 which should have been bundled with the Mercy Hospital claim #AH0003184841 for the same patient on the same date of service (08/13/2013);
- CHMB claim #14493120 which should have been bundled with the Mercy Hospital claim #AH0003200549 for the same patient on the same date of service (09/10/2013);
- CHMB claim #15715700 which should have been bundled with the Mercy Hospital claim #AH0003248527 for the same patient on the same date of service (12/03/2013); and
- CHMB claim #16132440 which should have been bundled with the Mercy Hospital claim #AH0003263843 for the same patient on the same date of service (01/05/2014).

*Id.* ¶ 191. By separately billing unbundled, duplicative claims which it was

specifically instructed to not bill pursuant to the Same-Day Rule, CHMB submitted

false claims to Medicare in violation of the FCA. *Id.* ¶ 192.

Similarly, through her access to FISS, Ms. Worthy identified a number of

physician practice claims billed by CHMB and paid by Medicare which CHMB was

instructed to void for bundling pursuant to Three-Day Rule. *Id.* ¶ 193. These claims

included:

- CHMB claim #15558520 for which CHMB billed $2,886.38 and which Medicare paid $843.35;
- CHMB claim #15112400 for which CHMB billed Medicare $506.21 and which Medicare paid $178.31;
- CHMB claim #14127300 for which CHMB billed Medicare $299.08 and which Medicare paid $168.67;
- CHMB claim #14210380 for which CHMB billed Medicare $448.70 and which Medicare paid $163.22; and
- CHMB claim #13924980 for which CHMB billed $329.34 and which Medicare paid $160.23.

*Id.* ¶ 194. All of these claims were ineligible for payment since they should have been

bundled with Mercy Hospital's inpatient DRG claims pursuant to the Three-Day

Rule. *Id.* ¶ 195. By billing these claims, despite receiving specific instructions to void the claims for bundling pursuant to the Three-Day Rule, CHMB submitted false claims to Medicare in violation of the FCA. *Id.*

## F. Accretive and Mercy Hospital Made False Statements to Avoid an Obligation to Return Overpayments Received from Medicare

Providers are required to report any overpayments to Medicare within 60 days of the identification of the overpayment or the date that any corresponding cost report is due, whichever is later. *Id.* ¶ 197. Pursuant to Medicare billing requirements, Mercy Hospital was required to file a quarterly Credit Balance Report (CMS-838) with Medicare which identified any "credit balances" or overpayments the Hospital received from Medicare as a result of billing or claims processing errors, duplicate payments for the same service, or payment for non-covered services. *Id.* Any overpayment retained by a provider after the deadline of reporting and returning the overpayment is an "obligation" for purposes of the reverse false claims provision of the FCA. *Id.* ¶ 198. In addition, Medicare may suspend payment to providers who fail to file the CMS-838 report. *Id.* In the CMS-838 report, an officer or administrator of the provider must certify that the information provided is "a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable Federal laws, regulations and instructions." *Id.* ¶ 199. In addition, the CMS-838 report states that "anyone who misrepresents, falsifies, conceals, or omits any essential information may be subject to fine, imprisonment, or civil money penalties under applicable Federal laws." *Id.*

Instead of identifying the payments the Hospital received as a result of CHMB's fraudulent billing, Mercy Hospital and Accretive improperly omitted these overpayments to avoid the obligation of repaying these amounts to Medicare and unlawfully certified that the information in the reports was true and accurate. *Id.* ¶ 200. Ms. Worthy was personally instructed by Ms. Kieltyka to prepare and submit CMS-838 reports for Q3 2013 and Q4 2013 which omitted the Medicare payments received by Mercy for the unbundled and duplicative facility fee claims submitted by CHMB. *Id.* ¶ 201. Although Ms. Worthy prepared the reports, she refused to sign the certification that the information was true and accurate because she knew that the reports omitted these improperly obtained payments. *Id.* Because Ms. Worthy refused to sign and submit these CMS-838 reports, Ms. Kieltyka personally signed them, falsely certified that they were true and accurate, and faxed them to National Government Services, the fiscal intermediary responsible for processing Mercy Hospital's claims. *Id.* Ms. Worthy informed Mr. Hachey of the submission of the false CMS-838 reports on her last day of work at Mercy in February 2014. *Id.* Ms. Worthy alleges on information and belief that Mercy Hospital did not inform Medicare about these improper CMS-838 reports or repay the improperly obtained funds to Medicare within 60 days as required by law. *Id.*

### G. CHMB's Mass Rebilling of Paid Claims

Medical billers typically follow up on unpaid claims every 30 days to correct and resubmit claims that have not yet been paid. *Id.* ¶ 202. Instead of reviewing individual Medicare claims and following up only on unpaid claims that had not been

paid or needed to be corrected and resubmitted, CHMB engaged in the improper mass rebilling of claims. *Id.* On October 8, 2013, October 28, 2013, and December 11, 2013, CHMB submitted claims to Medicare in mass rebills. *Id.* ¶ 203. Instead of verifying that the claims had not already been paid, Ms. Boos of CHMB instructed Claims Manager Grace Rusk to resubmit all claims, paid or unpaid, in a certain date range. *Id.* This mass resubmission of claims means that Defendants submitted, and Medicare paid, claims that had previously been submitted and paid. *Id.*

Ms. Worthy saw in the FISS system that some of these resubmitted claims had been paid. *Id.* For instance, on January 7, 2014, Ms. Worthy emailed CHMB's billers Yvette Ortiz and Melissa Thomas regarding a number of outpatient facility fee charges subject to the Same-Day Rule which she instructed them to void in Allscripts, but which they instead billed to Medicare, in some cases multiple times. *Id.* ¶ 204. In the email, Ms. Worthy noted that she had traced the history of a particular outpatient physician practice facility fee claim in FISS which CHMB billed to Medicare twice December 11, 2013 and which Medicare reimbursed twice on December 26th, even though Mercy notified CHMB to void the claim on November 15th. *Id.* ¶ 205. As a result, rather than paying Mercy once for both the physician-practice and hospital facility charges subject to the Same-Day Rule in a single, bundled claim, Medicare overpaid Mercy Hospital for three separate, duplicative claims. *Id.*

Through her review of FISS, Ms. Worthy discovered that this claim was not merely an outlier; rather, it was among the numerous other claims which CHMB

rebilled to Medicare even though CHMB or Mercy Hospital had already billed and received payment from Medicare for the associated charges. *Id.* ¶ 206. As of the date of Ms. Worthy's resignation, neither CHMB nor Mercy Hospital had taken any action to refund claims that were paid twice or to investigate which claims should have been refunded. *Id.* ¶ 207. Moreover, the Defendants conducted no investigation into claims that were subjected to mass rebilling and did not inquire to see if Medicare had paid duplicate payments for any of them. *Id.* ¶ 208.

## H.    CHMB and Mercy Falsely Billed for Unbundled Wound Care Supplies

Medicare pays facility fees to hospitals that include all overhead and supply costs. *Id.* ¶ 209. Because the facility fee bundles all of these costs together, hospitals should not submit individual claims for supplies or other charges included in the bundled facility fee. *Id.* CHMB re-categorized dressings and skin substitutes for wound care in order to bill separately for these items. *Id.* ¶ 210. CHMB changed the codes in the computer system after Mercy Hospital coders had correctly entered the codes into the computer system. *Id.* In particular, CHMB submitted claims for CPT code 99070, which is for "[s]upplies and materials (except spectacles), provided by the physician over and above those usually included with the office visit or other services rendered." *Id.* ¶ 211. These claims were false because the wound care supplies should be included with the wound care services rendered and should have been included in the bundled facility charge. *Id.*

Through her access to the FISS system, Ms. Worthy saw that false claims for 99070 for wound care supplies were being submitted to Medicare by CHMB. *Id.* ¶

212. For instance, in her January 14, 2014 weekly FISS update email, Ms. Worthy noted that CHMB had submitted 302 claims to Medicare involving wound dressings in which the revenue code for sterile supplies (272) was tied to CPT code 99070, including specific claims with dates of service of 11/21/2013, 11/22/2013, and 11/26/2013. *Id.* On January 14, 2014, Lora Morse, a Revenue Integrity auditor employed by Mercy Hospital, responded to Ms. Worthy's email, and expressed concern that CHMB had failed to contact her regarding denied claims for dressings and that CHMB had modified the billing code without her approval after these claims had been rejected by Medicare. *Id.* ¶ 213. Ms. Morse was concerned that by doing so, CHMB had exposed the Hospital to compliance issues. *Id.* Upon information and belief, CHMB never returned the wrongful reimbursements it obtained from improperly unbundling claims in this manner to Medicare. *Id.*

## I. Defendants Intentionally Upcoded Office Visits and Circumvented Medicare Screening Software

Physician office visits are assigned a level of service from 1 to 5, with Level 1 visits being the simplest and Level 5 the most complex. *Id.* ¶ 214. Medicare pays a reimbursement to physicians based on the level of service. *Id.* Higher level visits are reimbursed at a higher rate than lower level visits. *Id.* For physician practices that are wholly owned or operated by a hospital, and subject to separate facility fee billing, the facility fee also increases as the level of service increases. *Id.*

Accretive and CHMB devised a scheme to falsely inflate or "upcode" facility fees by one level by requiring coders to base the level of the office visit on an Accretive tool rather than on the clinical documentation. *Id.* ¶ 215. Upcoding the visit meant

that Medicare paid more than the correct amount for the office visit and also prevented Medicare from detecting that the claim was subject to the Same-Day Rule. *Id.* Ms. Kieltyka of Accretive and Ms. Hawkes of Mercy Hospital created the "matrix" introduced in an October 2013 meeting to train coders how to code and bill the facility fee component. *Id.* ¶ 216. By following the matrix as Accretive instructed, coders falsely increased the level of service for the facility fee. *Id.* Ms. Menezes opposed the use of this matrix and refused to attend the October 2013 meeting. *Id.*

The facility matrix scheme also had the effect of circumventing Medicare's screening software's attempts to identify claims submitted in violation of the Same-Day Rule. *Id.* ¶ 217. Medicare uses screening software to detect duplicate claims or certain claims that violate Medicare billing requirements. *Id.* ¶ 218. Medicare's Common Working File screens incoming electronic claims submitted to Medicare to search for inaccuracies. *Id.* The upcoding gave the impression that the two charges were not connected and therefore not subject to the Same-Day Rule and did not need to be bundled or screened out. *Id.* ¶ 220. Thus, the upcoding of the facility fee charge resulted in both falsely inflated facility fee charges and eliminated the ability of Medicare to detect claims that should have been bundled under the Same-Day Rule. *Id.* ¶ 221.

### J.   Defendants Fraudulently Upcoded to Increase Facility Fee at Physician Practices

In July 2013, Ms. Worthy was asked to fill in as a coder at New England Foot and Ankle, a podiatry and orthopedic practice wholly owned and operated by Mercy Hospital. *Id.* ¶ 222. While at New England Foot and Ankle, Ms. Worthy noticed that

nurses would check a box on the patients' "superbill" or office visit charge slip indicating that the patient was scheduled for surgery, even if this was false. *Id.* ¶ 223. Falsely indicating that a patient was scheduled for surgery increased the level of service for the facility fee component by two levels. *Id.* ¶ 224. During the period she was working at New England Foot and Ankle, Ms. Worthy reported this fraudulent upcoding of facility fees to her supervisor, Ms. Kieltyka. *Id.* ¶ 225. After approximately three days at the facility, she was instructed to leave New England Foot and Ankle and return to her usual job. *Id.* Ms. Worthy alleges on information and belief that the practice of falsely indicating a patient is scheduled for surgery to upcode facility fees continues. *Id.* ¶ 226.

## K. False Listing of Primary Diagnosis Code

Medicare does not cover certain services such as preventive physical exams and office visits solely for the purpose of establishing care with a new provider. *Id.* ¶ 227. These non-payable services are associated with a particular diagnosis code, such as V70.0 for "routine general medical exam." *Id.* Most Medicare patients have at least one secondary diagnosis, such as hypertension or anxiety, even if the primary purpose of the visit being billed is a non-payable service. *Id.* ¶ 228. To obtain payment for services with the primary diagnosis code V70.0, which Medicare would otherwise deny as non-payable, CHMB falsely listed a secondary diagnosis code as the primary diagnosis code in their claim submissions to Medicare. *Id.* ¶ 229. As a result of this fraudulent change in the primary diagnosis for the service being billed,

Medicare paid for services that were legally required not to be paid and that it otherwise would not have paid. *Id.*

## L. Retaliation

Ms. Worthy alleges that Mercy, CHMB, and Accretive unlawfully retaliated against her. *Id.* ¶ 241. Ms. Worthy says that she reported to her supervisors, including Ms. Kieltyka, at numerous times, all of the alleged violations. *Id.* ¶¶ 242, 243. On November 11, 2013, Ms. Worthy emailed Ms. Kieltyka and stated that it was becoming impossible to perform her job duties because CHMB representatives refused to speak with her about major Medicare billing violations. *Id.* ¶ 244. Ms. Kieltyka told Ms. Worthy that she was responsible for working with CHMB and also informed Ms. Worthy that she had told Mr. Hachey she was struggling at her job and had recommended she step down and take a new position as administrative assistant. *Id.* ¶¶ 245-46. At one point, Ms. Kieltyka told Ms. Worthy she let her team down by "throwing them under the bus." *Id.* ¶ 247.

A few days after Ms. Worthy submitted her complaint to Mercy's compliance officer, Defendants assigned Brie Farmer and Anvita Kumar, two contract employees from Accretive, to work in Ms. Worthy's office. *Id.* ¶ 248. Ms. Farmer and Ms. Kumar questioned Ms. Worthy about her daily workload and projects, accused her of poor decision-making, forbade her from sending emails without their initial review, and rummaged through her desk. *Id.* ¶¶ 249-50.

Ms. Worthy complained again to Ms. Kieltyka who told Ms. Worthy that she was "inexperienced" and that "it wasn't [her] time at Mercy Hospital." *Id.* ¶¶ 251-52.

She also said that she had reached out to a replacement for Ms. Worthy. *Id.* Ms. Kieltyka continued to criticize Ms. Worthy for her performance, advising her that she was responsible for the revenue recovered by CHMB. *Id.* ¶¶ 253-54. On January 28, 2014, Ms. Worthy gave her 30-day resignation notice, which made clear that she felt as though she was being forced out of Mercy. *Id.* ¶ 255. The harassment continued until the day Ms. Worthy left, with Ms. Kieltyka demanding a copy of the compliance packet Ms. Worthy provided to the compliance officer and Mercy's attorney. *Id.* ¶¶ 256-57.

## III. THE PARTIES' POSITIONS

### A. The Defendants' Motions to Dismiss

#### 1. The Mercy Defendants

The Mercy Defendants move to partially dismiss the claims in Ms. Worthy's Third Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). *Mercy's Mot.* at 1. Specifically, the Mercy Defendants move to dismiss all claims, except the reverse FCA claims in Count III and the FCA retaliation claim in Count V. *Id.* at 1, 6.

To begin, the Mercy Defendants lay out the pleading requirements that the relator must satisfy in order to survive a motion to dismiss under Rule 12(b)(6). *Id.* at 7. First, the complaint must "state a claim to relief that is plausible on its face." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In addition, they state that relators asserting FCA claims must also satisfy Rule 9(b). *Id.* (citing *United States ex rel. Heineman-Guta v.*

*Guidant Corp.*, 718 F.3d 28, 36 (1st Cir. 2013)). This requires that relators plead "with particularity the circumstances constituting fraud." *Id.* The Mercy Defendants explain that the purpose behind the rule is to "protect defendants whose reputation may be harmed by meritless claims of fraud, [ ] discourage 'strike suits,' and [ ] prevent the filing of suits that simply hope to uncover relevant information during discovery." *Id.* (quoting *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996)). Citing First Circuit caselaw, the Mercy Defendants explain that to satisfy Rule 9(b), an FCA complaint "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 8.

The Mercy Defendants first argue that the Court should dismiss Counts I & II of the Third Amended Complaint because certain of the theories that Ms. Worthy advances are not pleaded with particularity. *Id.* They allege that Ms. Worthy "has failed to plead with particularity the facts surrounding the submission of *any* false claim for payment linked to those theories" and that she "fails to provide the requisite 'who, what, where, and when' of these alleged fraudulent schemes." *Id.* (emphasis by Mercy).

The Mercy Defendants claim that to establish FCA liability, "merely alleging facts related to a defendant's alleged misconduct is not enough" and that a complaint must "connect allegations of fraud to particular false claims for payment, rather than a fraudulent scheme in the abstract." *Id.* at 9. They recognize that the First Circuit employs a flexible approach in assessing FCA complaints but state that a complaint

44

must be dismissed when its omits "among other fraud specifics, details concerning the dates of the claims, the contents of the forms or bills submitted, their identification numbers, [and] the amount of money charged to the government." *Id.*

The Mercy Defendants argue that Ms. Worthy "provides no details regarding *even one* allegedly false claim for payment submitted to the government." *Id.* at 9-10 (emphasis by Mercy). They compare these claims to some of Ms. Worthy's theories against the other Defendants, where, they concede, "she does attempt to detail specific exemplar claims." *Id.* at 10. The Mercy Defendants then compare Ms. Worthy's complaint to a complaint that a judge in this District recently dismissed because the relator had not "provided transactional detail for any claim." *Id.* (citing *United States ex rel. Webb v. Miller Family Enter.*, No. 1:13-cv-00169, 2014 U.S. Dist. LEXIS 163698, at *30-31 (D. Me. July 2, 2014)).

In addition, the Mercy Defendants argue that these allegations are "doomed by Worthy's failure to specify the time, place, and content of a particular false representation." *Id.* at 11 (internal quotations omitted). For example, they state that Ms. Worthy contends that Mercy engaged in the improper use of billing codes and modifiers, but that "she does not allege who in particular did so, when specifically the person did so, what the particular circumstances of the service were that rendered the code inappropriate, and whether the coding was ever communicated to the government." *Id.* The Mercy Defendants claim that Ms. Worthy's "generalized allegations are a far cry from the detailed assertions necessary to satisfy Rule 9(b) in an FCA suit." *Id.* They contend that Ms. Worthy's Complaint with respect to these

factual allegations "presents a classic example of a prohibited strike suit; designed to remedy its deficiencies through discovery." *Id.* at 12.

The Mercy Defendants also move to dismiss the allegations in Counts I & II regarding the Same-Day and Three-Day Rules for failure to plead an element of the claim. *Id.* at 6. The Mercy Defendants state that in order to sustain an FCA claim, the relator must establish that the defendant "knowingly misrepresented compliance with a *material precondition of payment*." *Id.* at 12 (emphasis added by Mercy). They allege that the Three-Day and Same-Day Rules are not preconditions of payment. *Id.* at 13, 15. The Mercy Defendants state that certain subparts of the relevant regulations, such as subpart C and N, include "unambiguous language designating certain requirements within those subparts as conditions of payment." *Id.* at 13-14. However, the Mercy Defendants argue that the Three-Day Rule is found in subpart A, which "lacks any similar language indicating that payment is contingent on compliance." *Id.* at 14. As a result, the Mercy Defendants submit that "under traditional canons of statutory interpretation, the regulations' plain text establishes that the Three-Day Rule is not a precondition of payment that can support FCA liability." *Id.* The Mercy Defendants make a similar argument with respect to the Same-Day Rule, claiming that none of the sources of the Rule establishes that it is a condition of payment. *Id.* at 15-16.

In addition, the Mercy Defendants argue that Ms. Worthy's allegations in Counts I and II regarding mass rebilling and unbundled wound care supplies should be dismissed because the allegations establish that Mercy did not act knowingly, an

essential element in the statute. *Id.* at 16-17. With respect to the mass rebilling, the Mercy Defendants cite the factual allegations in the Third Amended Complaint, which, in their view, show that "Mercy was unaware of the mass rebills until after they had been submitted" and that "Mercy was victimized by CHMB's affirmative representations." *Id.* at 17-18. With respect to the unbundled wound care supplies, the Mercy Defendants cite the factual allegations in the Third Amended Complaint, which, it submits, show that "CHMB undertook the allegedly improper re-categorization of wound care supplies only after the claims had been properly coded by Mercy, and CHMB did so without notifying or obtaining approval from Mercy." *Id.* at 18.

The Mercy Defendants also move to dismiss Count IV of the Complaint, Ms. Worthy's FCA conspiracy claim. *Id.* at 19. They state that to establish liability under the FCA for conspiracy, Ms. Worthy must "plead with particularity" the "existence of an agreement between the Defendants to violate the FCA." *Id.* They argue that Ms. Worthy has failed to do so. *Id.* at 19. Further, the Mercy Defendants allege that Ms. Worthy's "conspiracy claim rises and falls with the individual claims" and since her underlying claims fail, her conspiracy claim also fails. *Id.* at 19-20.

Lastly, the Mercy Defendants move to dismiss Ms. Worthy's retaliation claim in Count V under the MWPA because they claim it is untimely. *Id.* at 20. They state that under 5 M.R.S. § 4611, a charge of discrimination must be filed within 300 days of the alleged act of unlawful discrimination. *Id.* They note that Ms. Worthy submitted her resignation stating that she was being forced out of Mercy on January

28, 2014, and filed her Maine Human Rights Commission (MHRC) claim on December 18, 2014, over 300 days later. *Id.* at 20-21.

### 2. Accretive

Accretive joins the Mercy Defendants' motion to dismiss with respect to Counts I, II, and IV and incorporates their arguments into its own motion. *Accretive's Mot.* at 2-5.

Accretive separately moves for dismissal of Ms. Worthy's federal and state retaliation claims in Count V. *Id.* at 5. As a threshold matter, Accretive agrees with Mercy that Ms. Worthy's retaliation claim under the MWPA is time-barred and should be dismissed outright because she filed her complaint with the MHRC 324 days after she resigned and the statute requires such complaints to be filed within 300 days. *Id.* at 6 (citing 5 M.R.S. § 4611). Accretive then argues that Ms. Worthy fails to state a sufficient retaliation claim against it under the MWPA or FCA. *Id.* It states that liability under these statutes requires an employment-like relationship and that Ms. Worthy has not alleged that Accretive had sufficient control over her in order to act as an employer. *Id.* at 6-8. Additionally, Accretive claims that Ms. Worthy has not alleged enough facts to support her claim of constructive discharge. *Id.* at 8-10.

### 3. CHMB

CHMB also moves to dismiss Counts I, II, IV, and V of the Third Amended Complaint. *CHMB's Mot.* at 1. CHMB moves to dismiss Counts I and II because, it argues, the factual allegations set out against CHMB "fail to plead with particularity

the existence of a fraudulent scheme and they fail to plead with particularity the submission of any false claim for payment." *Id.* at 7. Just as the Mercy Defendants argued, CHMB alleges that Ms. Worthy's complaint fails to meet the pleading standards laid out by Rule 9(b) and the First Circuit because it does not specify the who, what, where and when of the alleged fraudulent schemes, nor does it connect the allegations to particular false claims for payment. *Id.* at 7-8. CHMB recognizes that Ms. Worthy "at least attempts to identify specific claims" in some sections of the complaint but claims that these allegations do not provide sufficient transactional detail to satisfy the particularity requirements of Rule 9(b). *Id.* at 8-9.

CHMB also argues that the theories in Counts I and II concerning the Three-Day and Same-Day Rules should be dismissed because the Rules are not preconditions of payment as required to impose FCA liability. *Id.* at 9-10. CHMB says that it "has nothing to add, subtract or alter with respect to" Mercy's discussion of this issue and therefore it adopts and incorporates Mercy's discussion by reference. *Id.* at 10.

CHMB further argues that the conspiracy claim in Count IV should be dismissed because it fails to meet the particularity requirements and because it is based on alleged false claims that were not pled with particularity. *Id.* at 10. Specifically, CHMB claims that Ms. Worthy did not plead with particularity the existence of any agreement because "[t]here were no allegations anywhere in the complaint alleging the who, what, where or when of any such agreement." *Id.* Additionally, CHMB states that a "conspiracy claim rises and falls with the

individual claims" and that Ms. Worthy's individual claims are insufficient to survive a motion to dismiss and therefore the conspiracy claim fails as well. *Id.* at 11.

Finally, CHMB argues that Count V should be dismissed because Ms. Worthy failed to plead CHMB's employer status and actions or conduct sufficient to support a claim of constructive discharge. *Id.* CHMB states that the MWPA provides protection against retaliation by an employer and that a joint employer relationship exists "where two or more employers exert significant control over the same employees and share or co-determine those matters governing essential terms and conditions of employment." *Id.* at 12-13. It lays out several factors courts consider to determine joint employer status, and then argues that "[i]n the 267 paragraphs of [Ms. Worthy's] complaint there is not a single factual allegation which, if proved, would establish any fact that would suggest or support an inference that CHMB was her joint employer." *Id.* at 13.

As for the claim of constructive discharge, CHMB states that Ms. Worthy must show that the harassment to which she was subjected was "objectively so severe and oppressive that staying on the job would have been intolerable." *Id.* at 14. CHMB asserts that the only specific, factual allegations against CHMB is that its "representatives were refusing to speak with [Ms. Worthy] about major Medicare billing violation issues." *Id.* It argues that this single allegation is insufficient to constitute constructive discharge. *Id.*

**B.    Consolidated Objection to Motions to Dismiss**

Ms. Worthy agrees with the Defendants that an FCA complaint must be pleaded with particularity in accordance with Rule 9(b) by setting forth the who, what, when, where, and how of the alleged fraud. *Pl.'s Opp'n* at 11-12. However, Ms. Worthy contends that under First Circuit law, there exists no "checklist of mandatory requirements that must be satisfied by each allegation included in a complaint." *Id.* at 12. She submits that district courts in the First Circuit have recognized a flexible approach and denied motions to dismiss where the complaint, although lacking any specific details about particular false claims, adequately alleged that the defendant actually presented false claims to the government. *Id.* at 12 (collecting cases).

Under this framework, Ms. Worthy argues that she has sufficiently alleged the resubmission of false claims with particularity. *Id.* at 13. Citing specific paragraphs of her Third Amended Complaint, she outlines the details she provided about who resubmitted the false claims, what unlawful billing practices were at issue, when the Defendants implemented the fraudulent billing practices, where the practices took place, and how the Defendants effectuated the alleged fraud. *Id.* at 13-15. She claims that these facts, taken together, "substantially and particularly describe the underlying fraudulent scheme that led to the submission of false claims." *Id.* at 15. She claims that she went further and points to places in the complaint where she "linked these practices with the presentment of false claims to Medicare." *Id.* Ms. Worthy objects to CHMB's motion to dismiss her claims regarding the Three-Day and Same-Day rules on the same grounds. *Id.* at 18-20.

Ms. Worthy distinguishes her case from the cases cited by Defendants. *Id.* at 16. She states that unlike in those cases where the relator was merely speculating about the false claims that could have been submitted, Ms. Worthy directly observed and personally identified and reviewed actual false claims in the Medicare claims processing computer system. *Id.* She argues that she has satisfied Rule 9(b) by pleading details about the billing practices and personal knowledge of the Defendants' submission of false claims. *Id.* at 17-18.

Next, Ms. Worthy contends that her FCA conspiracy claim in Count IV is sufficiently pleaded. *Id.* at 21. Ms. Worthy says that to plead an FCA conspiracy claim with particularity the relator must allege (1) who the co-conspirators are, (2) when or where they entered into an agreement, and (3) what overt acts they took in furtherance of the conspiracy. *Id.* She agrees with Defendants that because a conspiracy claim is predicated on an underlying FCA violation, the underlying violations must also be sufficiently pleaded. *Id.*

Ms. Worthy argues that the complaint alleges that Accretive and Mercy entered into two unlawful agreements to violate the FCA: (1) an agreement to falsify billing information to obtain payment on claims that Medicare had legitimately suspended from payment; and (2) an agreement to falsify patient discharge status indicators on inpatient claims to obtain increased payment from Medicare. *Id.* She points out the places in the complaint where she describes when the agreements occurred, who was involved, and what acts were taken to further the conspiracy. *Id.* at 21-22. She also argues that the complaint alleges an unlawful agreement between

52

all the Defendants to submit duplicative claims for overlapping facility fees and to conceal the overpayments as a result of these billings. *Id.* at 22. Again, she identifies the specific paragraphs of her complaint in which she provides details about the who, when, where, and what of these claims. *Id.* at 22-23.

Ms. Worthy then takes on the Defendants' argument that she has failed to state a claim with respect to the allegations of a violation of the Three-Day and Same-Day Rules because these are not conditions of payment. *Id.* at 23. She states that "Defendants' arguments upend elemental principles of False Claims Act liability: that contractors may not bill the government separately for claims that are required by law to be billed together at a lower, bundled rate." *Id.* Additionally, she states that Defendants' arguments "contradict the controlling precedent in this Circuit, which makes clear that a regulation need not contain the formulaic text – "condition of payment" – to establish the falsity of a claim." *Id.* at 24. Ms. Worthy contends that these rules are not "aspirational billing guidelines for which providers are afforded the discretion of complying" but "Congressionally-enacted, binding payment rules." *Id.* at 25.

Ms. Worthy also opposes Mercy and Accretive's argument that they are not liable for the mass rebilling and unbundling of wound care supplies because they did not act knowingly. *Id.* at 26. She argues that Mercy and Accretive are vicariously liable for CHMB's actions under principles of agency law. *Id.* at 27.

Lastly, Ms. Worthy disputes the Defendants' motions to dismiss her retaliation claims in Count V of the Complaint. *Id.* at 28. First, Ms. Worthy contends that her

claim of constructive discharge was timely filed under the MWPA. *Id.* She states that the date of her resignation occurred on February 21, 2014 when she actually resigned, not on January 28, 2014 when she gave her letter of resignation. *Id.* She suggests that the intervening time between the notice and resignation allowed an opportunity for the Defendants to take steps to end the retaliation and that under applicable law, the statute of limitations runs from the date one actually leaves employment because until that point, constructive discharge is not certain. *Id.* at 28-29.

Ms. Worthy also argues that the retaliatory hostile work environment claim is based on a series of retaliatory acts and that she has plausibly stated at least three separate bases for constructive discharge. *Id.* at 30-32. She says that the Third Amended Complaint specifically alleges that CHMB's refusal to speak with her and the other Defendants' failure to correct CHMB's retaliation made it impossible for her to do her job; that she was informed by her supervisor that she was being replaced; and that she had no choice but to resign or be complicit in the illegal acts. *Id.* at 32. Under these circumstances, Ms. Worthy argues, "it is certainly at least plausible that a reasonable person would have felt compelled to resign to avoid participating in unlawful activities." *Id.*

Finally, Ms. Worthy claims that Accretive is a joint employer and thus liable for constructive discharge and retaliatory harassment under the FCA and MWPA. *Id.* at 32-35. Additionally, she contends that even if Accretive and CHMB are not joint employers, the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4551 *et seq.*,

prohibits any person from interfering with an individual's rights under the Act and that the MWPA is among the rights protected by this statute. *Id.* at 34.

### C. The Defendants' Replies

#### 1. The Mercy Defendants

In their reply, the Mercy Defendants maintain that Ms. Worthy's factual allegations "are fatally defective because she has not pled them with the requisite particularity under Rule 9(b)." *Mercy's Reply* at 3. They agree that relators need not satisfy a "checklist of mandatory requirements," but they state that relators must provide sufficient details to enable defendants to "identify particular false claims for payment that were submitted to the government." *Id.* Citing Sixth Circuit caselaw, the Mercy Defendants state that a relator must "pl[e]ad with specificity . . . **characteristic examples** that are **illustrative of the class of all claims covered by the fraudulent scheme**." *Id.* (emphasis added by Mercy).

The Mercy Defendants insist that all of the arguments made by Ms. Worthy in her opposition fail. *Id.* First, they allege that the specific details Ms. Worthy invoked in support of her claims against Mercy are linked to her other theories, such as the Same-Day and Three-Day Rules. *Id.* They claim that "Worthy cannot plead one theory with particularity and use that as a ticket to subject Mercy to burdensome discovery on any other FCA theory she can imagine." *Id.* They state that "[e]xemplar claims are necessary for each distinct theory." *Id.* at 4.

Second, the Mercy Defendants dispute Ms. Worthy's argument that an FCA claim can survive Rule 9(b) "so long as it provides sufficient details to support that

false claims were actually presented and puts the defendant on notice." *Id.* They state that the First Circuit has rejected this proposition and they distinguish this case from the cases cited by Ms. Worthy, explaining that the complaints in the other cases alleged that every claim for payment was false, but here, Ms. Worthy only claims that some of the claims were false. *Id.*

Third, the Mercy Defendants object to Ms. Worthy's argument that pleading personal knowledge together with indicia of reliability is sufficient to satisfy Rule 9(b). *Id.* at 5. They claim that her argument is supported only by out-of-circuit cases and that the First Circuit has established that relators must plead specific claims of payment. *Id.* Further, the Mercy Defendants state that Ms. Worthy has not explained why, if she has personal knowledge, she failed to provide specific details. *Id.*

The Mercy Defendants also contend that Ms. Worthy is mistaken in her assertion that because 31 U.S.C. § 3729(a)(1)(B) does not contain a presentment claim, she need not provide particular claims for payment. *Id.* at 6. The Defendants state that under First Circuit law, Rule 9(b) applies with full force to this subsection and that the more flexible standard that Ms. Worthy seeks only applies to qui tam actions in which the defendant induced third parties to file false claims. *Id.*

Next, the Mercy Defendants reject Ms. Worthy's argument that the Three-Day and Same-Day Rules are preconditions of payment. *Id.* They respond to Ms. Worthy's argument that if the Rules are not preconditions, they are in effect unenforceable by

pointing out that the Rules are still enforceable, just not by a private citizen. *Id.* at 7.

The Mercy Defendants also oppose Ms. Worthy's argument that Mercy should be vicariously liable for CHMB's actions. *Id.* at 8. They explain that "vicarious liability in FCA cases should only be imposed when it would be 'entirely consistent with the underlying purpose of the FCA.'" *Id.* (quoting *United States v. Dynamics Research Corp.*, No. 03-cv-11965, 2008 WL 886035, at *15 (D. Mass. 2008)). According to the Mercy Defendants, this case does not meet that standard because the Mercy Defendants were actively misled by their principal and therefore are innocent. *Id.*

As for the conspiracy claim, the Mercy Defendants maintain that Ms. Worthy failed to allege any unlawful agreement among the Defendants to violate the FCA. *Id.* at 9. They state that she only alleged facts related to either the lawful business agreements among the Defendants or the alleged conduct that she contends violates the FCA. *Id.*

Finally, the Mercy Defendants maintain that Ms. Worthy's MWPA claim is untimely because, they claim, the limitations period begins to run on the date an employee gives notice of resignation, not the effective date of that resignation. *Id.* at 10.

### 2. CHMB

Like the Mercy Defendants, CHMB maintains that Ms. Worthy's claims in Counts I & II should be dismissed because, it argues, she is required to plead with particularity representative examples of the false claims covered by each of the

alleged schemes. *CHMB's Reply* at 1. It distinguishes the cases cited by Ms. Worthy, explaining that those cases acknowledged that relators must plead representative examples but concluded that because the relator alleged every invoice submitted was false, there was no need to identify particular invoices by date or number. *Id.* at 2. Here, CHMB states, "[t]he falsity of the claims depend largely on the particularized details contained within the claim forms submitted" and therefore, Ms. Worthy must plead characteristic examples. *Id.* at 3.

Additionally, CHMB emphasizes that Ms. Worthy "must provide representative examples of false claims for each of the fraudulent schemes she alleges and not blur the distinctions between the alleged schemes . . . by borrowing specific examples from some schemes to mask the lack of representative examples from other schemes." *Id.* They also maintain that Ms. Worthy has failed to provide the "who, what, where, when and how" tying CHMB to any particular scheme. *Id.* at 4-5.

As for Count IV, CHMB urges that Ms. Worthy fails to plead with particularity any agreement among the Defendants to defraud the government, or any agreement to do anything, and state that although corporations can be held liable, they act through individuals, but the complaint fails to contain any allegations that any of CHMB's employees entered into an agreement. *Id.* at 5-7.

Finally, CHMB contends that in the absence of an employer-employee relationship, CHMB may not be held liable for retaliation against Ms. Worthy. *Id.* at 7. It states that Ms. Worthy does not oppose the argument that CHMB is not a joint employer but instead asserts that CHMB can be held liable even if it was not her

employer. *Id.* at 8. According to CHMB, however, although MHRA generally authorizes actions against any persons, the relevant provisions are limited in their application to employers only. *Id.*

### 3. Accretive

In its reply, Accretive maintains that Ms. Worthy must plead specific details with respect to her claims in Counts I, II, and IV. *Accretive's Reply* at 2. It argues that Ms. Worthy's suggestion that she cannot provide any details because Defendants are in control of the records is belied by the fact that she does provide specific details for other theories. *Id.* at 2-3. It agrees with the Mercy Defendants that the more flexible approach for which Ms. Worthy argues only applies in cases involving the indirect submission of claims, which is not the case here. *Id.* at 3. Accretive says that Ms. Worthy disproves her own point that she need not plead any specific claims by relying on cases in which the complaints did plead specifics. *Id.* at 3-4. It also states that Ms. Worthy cannot rely on the discovery process to uncover relevant information. *Id.* at 4.

Accretive also objects to Ms. Worthy's contention that Accretive is liable vicariously through CHMB for mass rebilling and unbundling claims. *Id.* Accretive states that it still must have acted "knowingly" and Ms. Worthy has not pleaded facts supporting knowing participation by Accretive, and it states that she has pleaded no facts to support a theory that CHMB was an agent of Accretive. *Id.* at 4-5.

Lastly, Accretive argues that Ms. Worthy has failed to plead either a Maine or FCA retaliation claim against Accretive. *Id.* at 5. First, it states that under Maine

law the relevant date is the date of the notice, not the actual date of resignation. *Id.* Second, it argues that the alleged facts do not meet the standard for constructive discharge because they only demonstrate that the workplace conditions were difficult and unpleasant, not so intolerable to render a voluntary resignation a termination. *Id.* at 6. Third, Accretive claims that Ms. Worthy is unable to overcome the fact that Accretive was not Ms. Worthy's employer. *Id.* at 6-7.

## IV.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Under the general pleading standards, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

However, claims brought under the FCA must satisfy Rule 9(b)'s heightened pleading requirements. *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004). Rule 9(b) requires that any party alleging fraud or mistake "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). This standard "means that a complaint must specify 'the time, place, and content of an alleged false representation.'" *United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009) (quoting *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 731 (1st Cir. 2007)). Conclusory allegations are not sufficient. *Gagne*, 565 F.3d at 45. The First Circuit recognizes that there is some flexibility to this standard where "the complaint as a whole is sufficiently particular

to pass muster under the FCA." *Rost*, 507 F.3d at 732. The purpose of this requirement is to "give notice to defendants of plaintiff's claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery." *Doyle*, 103 F.3d at 194.

## V.     DISCUSSION

The FCA imposes liability on any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1)(A); (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(B); or (3) conspires to commit such violations. 31 U.S.C. § 3729(a)(1)(C). The FCA also forbids making or using a false record or statement to conceal, avoid, and/or decrease repayment obligations, called a "reverse false claim." 31 U.S.C. § 3729(a)(1)(G). In addition, it forbids retaliatory discharge based upon an employee's efforts to stop violations of the FCA. 31 U.S.C. § 3730(h).

Violations of the FCA may be enforced through civil actions initiated by either the Attorney General or private persons. *Id.* § 3730(a), (b). In the latter category of qui tam actions, the government has an opportunity to evaluate the complaint and decide whether to intervene. *Id.* § 3730(b)(2), (b)(4), (c)(1). A relator is entitled to recover a share of the proceeds regardless of whether the government intervenes. *Id.* § 3730(d).

Ms. Worthy filed a qui tam complaint on behalf of the Government alleging four counts against the Defendants for violations of the FCA. She also brings one count in her own name claiming retaliation in violation of both the FCA and MWPA. The Defendants contest all of the Counts in the Third Amended Complaint except for Count III, the "reverse false claim."

## A.      Counts I & II

In her factual allegations, Ms. Worthy sets forth several theories forming the basis for the claims in Counts I and II that the Defendants knowingly presented false claims or knowingly made or used false statements material to false claims. All of the Defendants move to dismiss these Counts arguing that certain of the allegations do not state an element of the claim and others do not satisfy the particularity requirement.

### 1.      Materiality

The First Circuit has "long held that the FCA is subject to a judicially imposed requirement that the allegedly false claim or statement be material." *United States ex rel. Jones v. Brigham and Women's Hosp.*, 678 F.3d 72, 82 (1st Cir. 2012) (quoting *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 307 (1st Cir. 2010)). Thus, in order to sustain an FCA claim, a plaintiff must establish that the defendant "misrepresented compliance with a material precondition of . . . payment." *New York v. Amgen Inc.*, 652 F.3d 103, 110 (1st Cir. 2011). All of the Defendants contend that the Same-Day and Three-Day Rules are not material preconditions of payment and

therefore Ms. Worthy has failed to state an element of her claim with respect to these factual allegations.

The thrust of the Defendants' argument is that the Three-Day and Same-Day Rules cannot be preconditions of payment because they are not expressly labeled as such in the regulations. *See, e.g.*, *Mercy's Mot.* at 13-16. However, as the Defendants pointed out in their first notice of supplemental authority, the United States Supreme Court recently addressed this exact issue in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) (*Escobar II*), an appeal of a First Circuit decision.[2] In *Escobar II*, the Supreme Court held that FCA liability for individuals who fail to disclose violations of legal requirements "does not turn upon whether those requirements were expressly designated as conditions of payment." *Escobar II*, 136 S. Ct. at 1996. The Supreme Court explained:

> Defendants can be liable for violating requirements even if they were not expressly designated as conditions of payment. Conversely, even when a requirement is expressly designated a condition of payment, not every violation of such a requirement gives rise to liability. What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision.

*Id.* Therefore, the fact that the provisions containing the rules may not be labeled "condition of payment" is relevant but not automatically dispositive of the materiality inquiry. *See id.* at 2001.

"[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at 2002; 31

---

[2] *United States ex rel. Escobar v. Universal Health Servs.*, 780 F.3d 504 (1st Cir. 2015).

U.S.C. § 3729(b)(4). Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar II*, 136 S. Ct. at 2002. The Supreme Court provided some direction as to the type of evidence the Court may consider in determining materiality:

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003-04. Ultimately, the *Escobar* Court remanded the materiality issue to the First Circuit for further proceedings. *Id.* at 2004.

On remand, the First Circuit applied a "holistic approach" to the materiality standard based on the Supreme Court's guidance. *United States ex rel. Escobar v. Universal Health Care Servs., Inc.*, 842 F.3d 103, 106, 109 (1st Cir. 2016) (*Escobar III*). The First Circuit focused on three factors: 1) whether regulatory compliance was a condition of payment; 2) the centrality of the requirement in the regulatory program; and 3) whether the Government pays claims despite actual knowledge that certain requirements were violated. *Id.* at 110. Applying *Escobar III*, the Court turns to whether the Three-Day and Same-Day Rules are material.

First, the Court addresses the parties' arguments as to whether the Rules are in fact designated as conditions of payment. The Defendants are correct that neither

regulation is expressly labeled as a "condition of payment." *See* 42 C.F.R. §§ 412.2(c)(5), 419.44. However, subpart C of the regulations states:

> If CMS determines, on the basis of information supplied by a [Quality Improvement Organization] that a hospital has misrepresented admissions, discharges, or billing information, or has taken an action that results in the unnecessary admission of an individual to benefits under Part A, unnecessary multiple admissions of an individual, or other inappropriate medical or other practices with respect to beneficiaries or billing for services furnished to beneficiaries, CMS may as appropriate . . . Deny payment (in whole or in part) under Part A . . .

42 C.F.R. § 412.48. The Three-Day Rule is a billing rule under Part A dealing with the bundling of preadmission services otherwise payable that are provided during the three calendar days immediately preceding a beneficiary's admission. 42 C.F.R. § 412.2(c)(5). Therefore, subpart C suggests that, under certain circumstances, CMS has the discretion to deny payment for a misrepresentation of the Three-Day Rule. Still, it is not "sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar II*, 136 S. Ct. at 2003.

By contrast, nowhere do the regulations or the MCPM suggest that noncompliance with the Same-Day Rule, which deals with outpatient services, could result in a denial of payment. *See* 42 C.F.R. § 419.44; MCPM, CMS Pub. No. 100-04, ch. 4, §§ 10.4, 170. However, "[d]efendants can still be liable for violating requirements even if they were not expressly designated as conditions of payment." *Escobar II*, 136 S. Ct. at 1996. Therefore, the Court must turn to the centrality of the requirements and the Government's actual behavior with respect to these requirements. *See Escobar III*, 842 F.3d at 110.

Ms. Worthy explains that the Three-Day and Same-Day rules are billing rules requiring that certain services be bundled instead of separately billed. *TAC* ¶¶ 46-50, 55-57. She alleges that Medicare would not have otherwise paid the claims had it known of the Defendants' violations of the Three-Day and Same-Day Rules. *TAC* ¶ 131. In addition, she alleges that the Defendants specifically made changes and created dummy accounts in order to get claims paid in violation of the billing rules and to conceal those payments. *TAC* ¶¶ 152-62. These allegations at least make it plausible that CMS would not have paid the Defendants had it known that Defendants misrepresented their compliance with the Rules, and that the Defendants were aware of this fact; in the Court's view, these allegations are sufficient to survive a motion to dismiss on this issue.

This conclusion is supported by the fact that the Government has previously taken action to prevent the type of double-billing and unbundling alleged here and has warned that duplicate billing "may generate an investigation for fraud." CMS, MLN Matters No. SE0415, Reminder to Stop Duplicate Billings at 1-2 (May 9, 2013); *see also* U.S. Dep't of Justice, Deputy Att'y Gen., Health Care Fraud Report Fiscal Year 1997 ("A major national project undertaken that yielded significant results was the 72 Hour Window Project, which detected and sought recoveries for double billings that occurred when hospitals billed Medicare for outpatient services rendered within 72 hours prior to hospital admission . . . Over $46 million was returned to the government"). Given that the Government has found violations of these rules to be "sufficiently important" to wage an investigation in the past, the Court concludes that

Ms. Worthy has stated a plausible claim under the FCA for the alleged violations of the Same-Day and Three-Day Rules. *See Escobar III*, 842 F.3d at 110 ("[T]he fundamental inquiry is 'whether a piece of information is sufficiently important to influence the behavior of the recipient'") (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016)).

### 2.    Knowingly

The text of the FCA and caselaw make clear that liability cannot arise under the FCA unless a defendant acted knowingly. *See* 31 U.S.C. § 3729(a); *Jones*, 678 F.3d at 95; *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 388 (1st Cir. 2011). For purposes of the FCA, knowingly means that a person 1) has actual knowledge of the information; 2) acts in deliberate ignorance of the truth or falsity of the information; or 3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. *Id.*

Mercy and Accretive object to the claims premised on the factual allegations concerning mass rebilling and the unbundling of wound care, arguing that they did not act knowingly as required to establish liability under the FCA. They argue that it was CHMB that submitted the mass rebills, but that CHMB denied doing so and falsely misrepresented to Accretive and Mercy that it was holding the billings for these claims, and that it was CHMB that re-categorized dressings and skin substitutes for wound care supplies, but only after Mercy correctly entered the codes. *Mercy's Mot.* at 17-18 (citing *TAC* ¶¶ 150-51, 179, 203, 205, 210).

It is true that based on these allegations, Mercy and Accretive may not have had actual knowledge of the mass rebills or re-categorization. However, the FCA also holds defendants liable if they acted in deliberate ignorance of or with reckless disregard for the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A). Ms. Worthy alleges that she repeatedly told staff members from Mercy and Accretive about the violations. *TAC* ¶¶ 242, 243. Yet, they did nothing in response. *Id.* ¶¶ 208, 213. Taken as true for the purposes of the motion, the Court concludes that these allegations are sufficient to show that Defendants acted with reckless disregard for the truth or falsity of the potential violations. Therefore, the Court determines that Ms. Worthy has stated a plausible claim that Mercy and Accretive acted "knowingly" under the FCA.[3]

### 3.    Particularity

The Defendants object to Counts I and II of the Third Amended Complaint first on the grounds that Ms. Worthy failed to plead with particularity any fraudulent scheme. The Court disagrees. Rule 9(b) requires that the "[u]nderlying schemes and other wrongful activities that result in the submission of fraudulent claims . . .be pled with particularity." *Karvelas*, 360 F.3d at 232. Relators must specify "the who, what, when, where, and how of the alleged fraud." *United States ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 123 (1st Cir. 2013). Ms. Worthy sets out ten separate

---

[3]    Ms. Worthy also argues that even if Mercy and Accretive did not act knowingly, they can be held liable under principles of vicariously liability. *Pl.'s Opp'n* at 26-27 (citing *United States v. O'Connell*, 890 F.2d 563, 568-69 (1st Cir. 1989) and *Dynamics Research Corp.*, 2008 WL 886035, at *15). Because the Court concludes that Mercy and Accretive could themselves be liable under the FCA, it does not reach that issue.

"schemes" that form the basis for her claims. Within each of these schemes, Ms. Worthy provides significant detail concerning who engaged in the fraud, when and where the fraud took place, what the individuals did, and how their actions were fraudulent.

For example, in Ms. Worthy's first theory, she alleges that the Defendants falsely modified and resubmitted claims that had been stopped by Medicare. *TAC* ¶¶ 66-121. She says that this scheme began in or around February 2013 and lasted at least until around December 2013. *Id.* ¶¶ 66, 79, 118. She names specific staff members, such as Jessica Martin, Brie Farmer, and Anvita Kumar, and says that these individuals instructed Mercy Hospital billers how to manipulate the claims in the system. *Id.* ¶¶ 81, 114. She discusses where these instructions took place, namely at "daily huddles" and "SWAT team" meetings. *Id.* ¶¶ 82, 84. She also explains exactly how the Defendants committed the fraud, by unbundling claims that were supposed to be bundled together through the false addition of -59 modifiers and G0 condition codes, and by deleting or otherwise omitting accident and injury information in order to obtain payment which Medicare held under the Secondary Payer procedures. *Id.* ¶¶ 67, 89-108. Further, she provides extensive background information of the regulatory framework for Medicare to show why the Defendants' actions were fraudulent. *Id.* ¶¶ 36-65.

Similarly, in her second theory, Ms. Worthy alleges that Accretive instructed staff to falsify patient discharge status indicators to increase reimbursement. *Id.* ¶ 122. She says that this scheme started in 2012 and has continued to the present,

specifically noting that the indicators were changed for the claims listed on Q1-Q4 2013 spreadsheets, as well as the Q1 2014 spreadsheet. *Id.* ¶¶ 122, 130. She names specific individuals who were involved in the scheme, including Jessica Martin, who created the spreadsheet of claims that originally did not have "discharge to home status," Judi Kieltyka who told Ms. Worthy this was a best practice, and one Mercy Hospital biller "TH" who changed the status indicators when Ms. Worthy refused to do so. *Id.* ¶¶ 124-126, 129, 130. She also explains how the fraud took place, by identifying claims that had been submitted with discharge statuses other than "discharge to home" and then changing and resubmitting those indicators, and why the acts were fraudulent, because they result in greater Medicare reimbursement. *Id.* ¶¶ 122-124, 130. Ms. Worthy continues this pattern of details for each alleged scheme. The Court concludes that Ms. Worthy has sufficiently pleaded details of the fraudulent schemes.

However, the Defendants are correct in stating that details concerning the fraudulent scheme alone are not enough to satisfy Rule 9(b) for FCA claims. *See Ge*, 737 F.3d at 124 ("Because FCA liability attaches only to false *claims* . . . merely alleging facts related to a defendant's alleged *misconduct* is not enough") (internal citations omitted) (emphasis in original); *Karvelas*, 360 F.3d at 234 ("[A]lleged violations of federal regulations are insufficient to support a claim under the FCA"). Relators must also connect the fraud to the actual submission of a false claim for payment. *Ge*, 737 F.3d at 124; *Gagne*, 565 F.3d at 47; *Karvelas*, 360 F.3d at 232 ("[S]uch pleadings invariably are inadequate unless they are linked to allegations,

stated with particularity, of the actual false claims submitted to the government that constitute the essential element of an FCA qui tam action"). The First Circuit has listed certain transactional details that may help a relator identify particular false claims, such as:

> [D]etails concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices.

*Karvelas*, 360 F.3d at 233 (internal citation omitted). At the same time, the First Circuit has made clear that "[t]hese details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint." *Id.* Yet, "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." *Id.*[4]

The Defendants argue that Ms. Worthy fails to plead with particularity the actual false claims submitted to the government for payment. Again, the Court disagrees. As Ms. Worthy points out in her reply, she identifies specific transactional details for several of her claims. Ms. Worthy is the most specific in her allegations in paragraphs 190, 191, and 194, where she provides actual claim numbers, amounts, and dates for the alleged violations of the Same-Day and Three-Day Rules. She also

---

[4] Ms. Worthy relies on cases such as *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13 (1st Cir. 2009), and *United States ex rel. Leysock v. Forest Labs., Inc.*, 55 F. Supp. 3d 210 (D. Mass. 2014), for the proposition that she does not need to plead particular details of false claim submissions. *Pl.'s Opp'n* at 17-18. However, as the Defendants correctly point out, these cases concern defendants who induced third parties to submit claims. By contrast, the prevailing standard when defendants themselves submit the false claims is that the relator must specify at least some actual submissions of false claims. *See e.g., Karvelas*, 360 F.3d at 222; *see also Webb*, 2014 U.S. Dist. LEXIS 163698, at *7-8.

provides identification codes and the specific dates on which CHMB submitted mass rebills in paragraphs 203, 205, and 212. In addition, Ms. Worthy provides some transactional details for her other allegations. For example, in paragraphs 115-118, which deal with the false addition of -59 modifiers and G0 condition codes, Ms. Worthy explains that she reviewed reports beginning in fall 2013 and identified changes to high value claims in FISS made by one biller DD, including the deletion of E codes on potential MSP claims and the addition of G0 condition codes and -59 modifiers, and states that these claims had subsequently been paid by Medicare. Additionally, in paragraphs 126-130, which deal with the falsification of patient discharge status indicators, Ms. Worthy states that, upon information and belief, one biller TH changed and resubmitted the discharge status indicators on the Q1-Q4 2013 spreadsheets, as well as the Q1 2014 spreadsheets.

Although some of these statements are made "on information and belief" they are still sufficient as long as "the complaint set[ ] forth the facts on which the belief is founded." *See Karvelas*, 360 F.3d at 226 (quoting *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir 1987)). Here, Ms. Worthy explains that Accretive staff asked her to make the changes and resubmit the claims, claiming that it was a "best practice" but that she refused to do so believing it was illegal. Yet, she alleges that she personally observed that these claims had subsequently been paid by Medicare. Taking her allegations as true for the purposes of the motion to dismiss, they provide sufficient factual support for her belief that someone else must have submitted the claims.

The Court acknowledges that Ms. Worthy does not identify specific transactional details for each and every claim in her complaint. However, she does not have to. *See Karvelas*, 360 F.3d at 233 ("[S]ome of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)"). Ms. Worthy has provided transactional details for at least some of her claims. This stands in contrast to the complaints in *Gagne, Ge*, and *Karvelas* which did not allege any specific facts about any claims submitted to the government. *See Ge*, 737 F.3d at 124; *Gagne*, 565 F.3d at 47; *Karvelas*, 360 F.3d at 233. Ms. Worthy's Third Amended Complaint "as a whole is sufficiently particular to pass muster under the FCA." *See Rost*, 507 F.3d at 732 (citing *Karvelas*, 360 F.3d at 233 n.17).

This conclusion is further supported by the fact that one of the main purposes of the particularity requirement is to avoid lawsuits by "'parasitic' relators who bring FCA damages claims based on information within the public domain or that the relator did not otherwise discover." *Ge*, 737 F.3d at 123 (quoting *Rost*, 507 F.3d at 727). In this case, Ms. Worthy garnered the information alleged in the complaint from her own direct, personal observations during her employment at Mercy Hospital, not from the public domain. Nor in the Court's view does Ms. Worthy's claim have the earmarks of a "strike suit," where the courts act to "prevent the filing of suits that simply hope to uncover relevant information during discovery." *Doyle*, 103 F.3d at 194. Moreover, based on the allegations in the Third Amended Complaint, the Defendants are, in the Court's view, able "to prepare an appropriate defense." *Guidant*, 718 F.3d at 36. The Court acknowledges the problems of

reputational damage and costly and labor-intensive discovery. *Id.* But these are problems for defendants even in meritorious FCA cases. The Court is at least capable of reining in discovery through the imposition of sensible, often agreed-upon restrictions.

In sum, the Court concludes that the allegations forming the basis for Counts I and II in the Third Amended Complaint are sufficiently pled under Rule 9(b).

## B.    Count IV

To survive a motion to dismiss on a conspiracy claim under the FCA, a plaintiff must show that Defendants entered into an unlawful agreement to defraud the government and took one or more acts in furtherance of the agreement. *United States ex rel. Estate of Cunningham v. Millennium Labs. of California*, No. 09-12209-RWZ, 2014 WL 309374, at *2 (D. Mass. Jan. 27, 2014). A relator must plead the conspiracy with particularity in accordance with Rule 9(b) by alleging facts as to (1) who the co-conspirators are, (2) when or where they entered into an agreement to defraud the government, or (3) what overt acts they took in furtherance of the conspiracy. *Leysock*, 55 F. Supp. 3d at 221; *see Gagne*, 565 F.3d at 45.

Defendants argue that Ms. Worthy has not pleaded any agreement between the Defendants to defraud the Government. *Mercy's Mot.* at 19. The Court agrees with the Defendants insofar as Ms. Worthy has not pleaded any facts demonstrating an express agreement between the Defendants. However, a relator may plead conspiracy with particularity "by alleging conduct from which the court can naturally infer an agreement among multiple parties." *United States v. Coloplast Corp.*, No.

11-12131-RWZ, 2016 WL 4483868, at *2 (D. Mass. July 29, 2016) (citing *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 194 (5th Cir. 2009)); *see also United States v. Newell*, 658 F.3d 1, 13-14 (1st Cir. 2011) (holding that in the context of 18 U.S.C. § 669, a conspiratorial "agreement may be shown by a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose").

In the Third Amended Complaint, Ms. Worthy alleges that the Defendants had an infused management and billing structure in which all of the Defendants worked in an integrated manner. *TAC* ¶¶ 18, 22. She also alleges that on numerous occasions, she informed staff members of each of the Defendants about the potential violations but no changes were made. *Id.* ¶¶ 119, 120, 127, 138, 175, 188. Although certain staff members stated at times that they would look into the issues, their plans never resulted in any action or were later cancelled. *Id.* ¶¶ 164, 169, 171, 188. In addition, Ms. Worthy alleges details of the steps that the Defendants took to continue and conceal the violations. *Id.* ¶¶ 85, 93. Taken as true, one could infer from these facts that the Defendants had a tacit or implied agreement to defraud the Government. Thus, the Court concludes that Ms. Worthy has pleaded sufficient facts to survive a motion to dismiss on this issue.[5]

### C.    Count V

---

[5]    Defendants also argue that her conspiracy claim must rise and fall with her other claims and because her other claims are not pleaded with particularity her conspiracy claim too must fail. However, as already discussed, the Court concludes that Ms. Worthy has pleaded her individual claims with particularity.

Ms. Worthy claims that the Defendants retaliated against her unlawfully in violation of the FCA and the MWPA, resulting in her constructive discharge and a hostile and abusive work environment. *TAC ¶¶* 241-67. As a threshold matter, all of the Defendants move to dismiss the MWPA claim alleging that it is time-barred. Accretive and CHMB additionally move to dismiss the MWPA and the FCA retaliation claims arguing that they are not employers and there is no constructive discharge.

### 1.    Untimely Filing of MWPA Claim

Although Ms. Worthy initially objected to the dismissal of her MWPA retaliation claim, *Pl.'s Opp'n* at 28-29, she later conceded that she did not timely file her constructive discharge claim in light of the United States Supreme Court's decision in *Green v. Brennan*.[6] *Pl.'s Notice of Suppl. Authority* (ECF No. 86). The Court agrees.

The MWPA prohibits discrimination by employers against employees who report the employer for violations of law. 26 M.R.S. § 833. MWPA claims are brought pursuant to the MHRA. 26 M.R.S. § 834-A. In order to pursue a claim for damages in federal court under the MHRA, a plaintiff must first file a complaint with the MHRC. 5 M.R.S. § 4622(1); *Flood v. Bank of Am.*, No. 1:12-cv-00105-GZS, 2012 WL 6111451, at *2 (D. Me. Dec. 10, 2012). This complaint must be filed within 300 days of the alleged act of unlawful discrimination. 5 M.R.S. § 4611.

---

[6]    *Green v. Brennan*, 136 S. Ct. 1769 (2016).

The statute of limitations period begins to run "when an employee receives unambiguous and authoritative notice of an employer's adverse discriminatory decision." *Kezer v. Cent. Me. Med. Ctr.*, 2012 ME 54, ¶ 17, 40 A.3d 955; *LePage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 15, 909 A.2d 629. "[A] constructive discharge claim accrues–and the limitations period begins to run–when the employee gives notice of his resignation, not the effective date of that resignation." *Green*, 136 S. Ct. at 1782. In this case, Ms. Worthy gave her notice of resignation on January 28, 2014 and did not file her claim with the MHRC until December 18, 2014, over 300 days later.

However, Ms. Worthy correctly points out that the lack of timely filing with the MHRC is not fatal to her claim under the MHRA but only limits her to equitable relief. *See* 5 M.R.S. § 4622. She also contends that the lack of timely filing has no application to her retaliatory harassment claims under the MHRA because the *Green* decision is limited to constructive discharge claims. *Pl.'s Notice of Suppl. Authority* at 2. At oral argument, the Defendants agreed that the untimely filing only affects Ms. Worthy's request for monetary damages and attorney's fees on her constructive discharge claim. The Court accepts the Plaintiff's and Defendants' mutual concession and by agreement it dismisses only the portion of Ms. Worthy's MWPA constructive discharge claim seeking monetary damages and attorney's fees.

### 2. Joint Employers

Accretive and CHMB claim that they are not joint employers and thus cannot be liable for retaliation under either the FCA or MWPA. "A joint employer

relationship exists where two or more employers exert significant control over the same employees and share or co-determine those matters governing essential terms and conditions of employment." *Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 163 (1st Cir. 1995). The First Circuit has discussed several factors that may be used in determining the existence of joint employer status, including: supervision of the employees' day-to-day activities; authority to hire, fire, or discipline employees; authority to promulgate work rules, conditions of employment, and work assignments; participation in the collective bargaining process; ultimate power over changes in employer compensation, benefits and overtime; and authority over the number of employees. *Id.* (citing *Rivas v. Federacion de Associacias Pecuarias de Puerto Rico*, 929 F.2d 814, 820-21 (1st Cir. 1991) and *Holyoke Visiting Nurses Ass'n v. NLRB*, 11 F.3d 302 (1st Cir. 1993)). Significantly, for purposes of the pending motions, whether joint employer status exists "is essentially a factual question." *Id.*; *Holyoke Visiting Nurses*, 11 F.3d at 306; *Rivas*, 929 F.2d at 820.

Accretive and CHMB argue that the only allegation supplied by Ms. Worthy to support her claim that they are joint employers is found in paragraph 242, which is conclusory. *Accretive's Mot.* at 7; *CHMB's Mot.* at 13. The Court agrees that the relevant part of paragraph 242 of the Third Amended Complaint, which states "Accretive and CHMB operated with Mercy Hospital as her joint employers controlling and directing her work conditions," is a legal conclusion in the guise of a factual assertion. Therefore, the Court need not accept it as true for the purposes of this motion.

However, Ms. Worthy has alleged additional facts that are sufficient to support her claim that Accretive was her joint employer with Mercy. For example, Ms. Worthy claims that Accretive and Mercy had an "infused management" structure in which Accretive staff members were integrated into the Hospital's billing operations and Mercy employees were managed by Accretive. *TAC* ¶ 18. Her direct supervisor was an Accretive employee and Accretive employees supervised her on a daily basis. *Id.* ¶¶ 242, 248-49. Additionally, her Accretive supervisor recommended her discharge and looked for her replacement. *Id.* ¶ 246, 252. Because the determination of joint employer status is a fact-intensive inquiry and because Ms. Worthy has alleged enough facts indicating Accretive's control over the conditions of her employment, her retaliation claims cannot be dismissed as to Accretive. *See Cannell v. Corizon, LLC*, No. 14-CR-64, 2015 U.S. Dist. LEXIS 166153, at *14 (D. Me. Dec. 11, 2015).

By contrast, Ms. Worthy has not supplied similar facts concerning CHMB. All the Court has been able to find with respect to CHMB's status as a joint employer is the conclusory statement contained in paragraph 242. This conclusory statement is not sufficient to survive a motion to dismiss. Potentially recognizing the lack of facts to support CHMB's status as a joint employer, Ms. Worthy argues that CHMB can be held liable under both the MWPA and FCA even if it is not her joint employer. *Pl.'s Opp'n* at 34-35.

Ms. Worthy argues that the MHRA does not limit its scope to employers and instead prohibits any "person" from "interfer[ing] with any individual in the exercise

of enjoyment of the rights . . . protected by this act." *Id.* at 34 (citing 5 M.R.S. § 4633(2)). Because the retaliation provisions of the MWPA are among the rights protected under the MHRA and because "person" under the MHRA includes "one or more individuals, partnerships, associations, [and] organizations," *see* 5 M.R.S. § 4553(7), she argues that CHMB can be liable for interfering with her right to whistle-blow. *Pl.'s Opp'n* at 34. Yet, as CHMB correctly points out, the Maine Law Court has explicitly said that although the discrimination provision of the MHRA applies to any person, the rights protected by the relevant employment discrimination provision of the MHRA and retaliation provisions of the MWPA are limited in their application to employers only. *See Fuhrmann v. Staples Office Superstore East, Inc.*, 2012 ME 135, ¶ 24 n.7, 58 A.3d 1083; *see also* 26 M.R.S. § 833(1)(A) ("No employer may discharge . . . "). Therefore, the Maine Law Court concluded that only an employer can be liable for employment discrimination under the MHRA. *Fuhrmann*, 2012 ME 135, ¶ 24 n.7 ("Although the MHRA generally authorizes actions for discrimination against the 'person or persons' who commit discrimination, 5 M.R.S. § 4621 (2011), the relevant portion of the employment discrimination section of the MHRA applies only to 'employer[s],' 5 M.R.S. § 4572(1)(A)(2011)"). Although the *Fuhrmann* case dealt with individual supervisor liability, the basic premise applies with equal force to this case. Only an employer can be liable under the MHRA for retaliation for whistle-blowing activity. To hold otherwise would mean that even though an individual supervisor cannot be held liable, a non-employer third party could be.

Ms. Worthy also claims that CHMB is liable under the MWPA because it "participated in unlawful discrimination against her by aiding and abetting other Defendants' unlawful discrimination in violation of 5 M.R.S. § 4553(10)(D)." *Pl.'s Opp'n* at 34 n.32. Ms. Worthy has cited no decision by any court in the state of Maine that has held or even addressed whether a non-employer can be liable for aiding and abetting in the context of a MWPA retaliation claim. In the absence of any state authority for her self-proclaimed position, it is noteworthy that the First Circuit has cautioned litigants who choose to come to federal rather than state court that they "cannot expect that new trails will be blazed." *Hearts With Haiti, Inc. v. Kendrick*, No. 2:13-cv-00039-JAW, 2015 WL 3649592, at * 3 (D. Me. June 9, 2015) (quoting *Ryan v. Royal Ins. Co. of Am.*, 916 F.2d 731, 744 (1st Cir. 1990)). In the face of such novel questions of state law, "litigants must provide a federal court with a 'well-plotted roadmap showing an avenue of relief that the state's highest court would likely follow.'" *Id.* (quoting *Ryan*, 916 F.2d at 744). No such roadmap has been provided here. Indeed, if the MWPA retaliation provisions were interpreted as Ms. Worthy urges, the exception to Maine Supreme Judicial Court's holding in *Fuhrmann* would become the rule since an aiding and abetting allegation would necessarily survive a motion to dismiss and might even survive a motion for summary judgment, causing non-employers to fall within the MWPA in a manner contrary to *Fuhrmann*. The Court declines to create an exception to the *Fuhrmann* rule based on the aiding and abetting provision of the MWPA.

Similar to the MWPA, a defendant in an FCA retaliation case must have an employment-type relationship with the plaintiff. *See* 31 U.S.C. § 3730(h) ("Any employee, contractor, or agent shall be entitled to all relief . . ."); *see also Vander Boegh v. Energy Sols., Inc.*, 772 F.3d 1056, 1062-64 (6th Cir. 2014) (interpreting the terms "contractor" and "agent" to be limited to employment-like relationships). At oral argument, Ms. Worthy argued that she was an agent of CHMB. Agency is a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006). The factual allegations in the Third Amended Complaint are not sufficient to generate a reasonable inference that a principal-agent relationship existed between CHMB and Ms. Worthy. Therefore, the Court concludes that the retaliation charges under both the FCA and MWPA should be dismissed as to CHMB only.

### 3. Constructive Discharge

Accretive and CHMB argue that Ms. Worthy has not pleaded sufficient facts to show constructive discharge. Because the Court concludes that CHMB is not a joint employer and cannot be held liable for retaliation, it will only address the constructive discharge argument with respect to Accretive.

To establish constructive discharge, an employee must show that "conditions were so intolerable that they rendered a seemingly voluntary resignation a termination." *Torrech–Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 50 (1st Cir. 2008).

"[I]n order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will." *Id.* In other words, an employee "must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship." *Id.* Furthermore, the standard "is an objective one; it cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held." *Roman v. Potter,* 604 F.3d 34, 42 (1st Cir. 2010) (citation omitted).

"To prove constructive discharge, a plaintiff must usually 'show that her working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign.'" *Torrech-Hernandez*, 519 F.3d at 50; *see also Gerald v. Univ. of P.R.*, 707 F.3d 7, 25 (1st Cir. 2013); *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014). Constructive discharge may occur when a reasonable employee would have believed that her termination was imminent, *Torrech-Hernandez*, 519 F.3d at 51, or when an employer effectively prevents an employee from performing her job. *Sanchez v. P.R. Oil Co.*, 37 F.3d 712, 719 (1st Cir. 1994) (citing *Aviles–Martinez v. Monroig,* 963 F.2d 2, 6 (1st Cir. 1992) (finding constructive discharge when an employer, inter alia, "removed all of [plaintiff's] files and then chastised him for not doing his work") and *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir. 1984) (finding constructive discharge where supervisor removed all work and responsibilities from employee), *cert. denied*, 469 U.S. 1145 (1985)).

Accretive claims that, as alleged in the Third Amended Complaint, its actions do not rise to the level of constructive discharge, only to mere frustration and unpleasantness. *Accretive's Mot.* at 9-10. The Court disagrees. Ms. Worthy alleges that she told Accretive staff members numerous time about the potential violations of law and that she told her supervisor at Accretive she could not perform her job duties because CHMB representatives refused to speak with her; yet, Accretive did nothing. *TAC* ¶¶ 243-45. Instead, Ms. Worthy's supervisor told Mr. Hachey that Ms. Worthy was struggling and should step down and become an administrative assistant. *Id.* ¶ 246. Accretive employees questioned Ms. Worthy daily, rummaged through her desk, and searched her work projects. *Id.* ¶¶ 249-50. Her supervisor not only told her she was being replaced, but also informed her that she had "reached out to someone at Dartmouth Hitchcock Medical Center in New Hampshire to replace [her]." *Id.* ¶ 252. She was also criticized and berated with derogatory statements. *Id.* ¶¶ 253-54. These allegations make it plausible that a reasonable person would have felt compelled to resign or believed that termination was imminent. Given that constructive discharge is a fact-intensive inquiry and Ms. Worthy has pleaded sufficient facts to support her claim, the motion to dismiss with respect to Accretive is denied.

## VI. CONCLUSION

The Court hereby GRANTS in part and DENIES in part Mercy's Motion for Partial Dismissal (ECF No. 66). The Court DENIES the motion with respect to Counts I, II, and IV. The Court accepts the parties' agreement and GRANTS the

motion with respect to Count V for the MWPA constructive discharge claim insofar as it seeks attorney's fees and damages.

The Court also GRANTS in part and DENIES in part Accretive's Motion to Dismiss (ECF No. 68). The Court DENIES the motion with respect to Counts I, II, and IV. The Court accepts the parties' agreement and GRANTS the motion with respect to Count V for the MWPA constructive discharge claim insofar as it seeks attorney's fees and damages.

Finally, the Court GRANTS in part and DENIES in part CHMB's Motion to Dismiss (ECF No. 67). The Court DENIES the motion with respect to Counts I, II, and IV and GRANTS the motion with respect to Count V in its entirety.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 18th day of January, 2017